# 𝔚𝔶𝔱𝔥𝔢𝔳𝔦𝔩𝔩𝔢.

## ROBERT LEE FENNER v. COMMONWEALTH.

June 13, 1929.

The opinion states the case.

*Leith S. Bremner, Thos. O. Moss,* and *E. L. Travis,* for the plaintiff in error.

*John R. Saunders, Attorney-General, Leon M. Bazile* and *Edwin H. Gibson, Assistant Attorneys-General,* for the Commonwealth.

PRENTIS, C. J., delivered the opinion of the court.

The accused has been convicted of robbery and sentenced to twelve years imprisonment in the State penitentiary.

The Chesterfield County Bank, located at Chester, just before three o'clock in the afternoon, December 21, 1927, was entered and robbed by two unmasked men. They were both armed. The assistant cashier and a young woman, an employee of the bank, were required to hold up their hands, and at the point of pistols marched to the bank vault, confined therein, $4,722.10 in money was taken, and the door of the vault closed while the robbers escaped. The case is here for review.

█ The accused sought to prove an alibi.

The first assignment of error is based upon this instruction: "The court instructs the jury. that although the burden rests upon the Commonwealth to make out its case against the accused to the exclusion of any reasonable doubt, yet, where the accused relies upon or attempts to prove an alibi in his defense, the burden of proving the alibi rests upon him."

It is strange that prosecuting attorneys continue to ask for this instruction and trial courts continue to give it, for while similar instructions have been held harmless, they have frequently been criticised, and these criticisms show that there is no difficulty in

framing a proper instruction covering the point and fair to the accused, which could not be questioned.

There have been two recent cases in this jurisdiction.

In *Draper* v. *Commonwealth*, 132 Va. 648, 661, 111 S. E. 471, 475, this is said as to an instruction substantially similar: "The proposition contained in the concluding part of the foregoing instruction gives rise to the question here under consideration. That proposition, standing alone, would indicate that there must be a preponderance of evidence for the alibi, and would constitute reversible error were it not rendered harmless by the context, and by the language of other instructions in the case."

In that case this is quoted from 2 Am. & Eng. Ency. (2d ed.) page 53: "Alibi is regarded by some courts as a special affirmative defense, but the better doctrine seems to be that it is not a defense in the accurate meaning of the term, but a mere fact shown in rebuttal of the State's evidence; and, consequently, the evidence introduced to support it should be left to the jury, uninfluenced by any charge from the court tending to place it upon a different footing from other evidence in the case or calculated to disparage and excite prejudice against it. See also *State* v. *Kelly*, 16 Mo. App. 213; *Albritton* v. *State*, 94 Ala. 76, 10 So. 426; *State* v. *Reed*, 62 Ia. 40, 17 N. W. 150; *State* v. *Rockett*, 87 Mo. 666; 1 Bishop Crim. Proc. 1062."

The rule is thus stated in Beale's Crim. Pl. & Pr., section 289: "Thus, where the evidence offered by the defendant is of an alibi—that is, that he was at another place at the time the crime was committed, and therefore could not have committed it—he is obviously merely disproving the truth of the prosecution's evidence or inference from evidence; he is making an entirely negative defense. It is not for him to establish

an alibi, but simply to throw doubt on the case of the prosecution. Clearly, therefore, when he produces evidence tending to prove an alibi, no burden is on him; if he raises a reasonable doubt of the charge, he is to be acquitted." 4 Wigmore on Evidence, page 3561, section 2512, par. (a), and cases cited in note 3.

■ In *Draper* v. *Commonwealth, supra*, we approved the following statement from 2 Am. & Eng. Enc. (2d ed.), page 56: "The true doctrine seems to be that where the State has established a *prima facie* case and the defendant relies upon the defense of alibi, the burden is upon him to prove it, not beyond a reasonable doubt, nor by a preponderance of the evidence, but by such evidence, and to such a degree of certainty, as will, when the whole evidence is considered, create and leave in the mind of the jury a reasonable doubt as to the guilt of the accused."

The reason the instruction in the *Draper Case* was not held to be reversible error was because it was rendered harmless by the context and by the language of other instructions in the case.

In *Jolly* v. *Commonwealth*, 136 Va. 764, 118 S. E. 109, a similar instruction was held harmless for like reasons, *i. e.*, because of other instructions which sufficiently emphasized the correct rule.

■ When such an instruction as to the burden resting on the accused to prove his alibi is given, the qualification should be expressed therein.

In this case the trial court told the jury that the instructions must be considered as a whole, and also gave the jury a specific instruction referring to the identity of the accused—his alibi—thus: "The court instructs the jury that so far as the identity of the defendant is concerned, that if they believe from the evidence and the circumstances proven that there is a

reasonable doubt as to whether the witnesses might not be mistaken as to his identity, then the jury cannot convict the defendant; the evidence and circumstances tending to establish his identity must be such as, with other testimony, produces a degree of certainty in the minds of the jury so great that they have no reasonable doubt as to the identity of the defendant."

This instruction, together with several others which repeatedly told the jury that they could not convict the prisoner unless they believed him guilty to the exclusion of every reasonable doubt, is sufficient in our opinion to justify the conclusion that the jury were not misled in this case by the instruction complained of.

The second assignment of error is based upon the refusal of the court to set aside the verdict upon the ground of after-discovered evidence.

The accused had been sentenced April 21, 1928. Three weeks later, but during the same term, he filed a number of affidavits, in support of the motion, the substance of which may be thus summarized: Anna Johnstone, then recently widowed, claiming to have been the wife of Robert L. Johnstone, a notorious criminal, made oath that her deceased husband had confessed to her that he, together with one Fay Green, were the two persons who committed the robbery; that she felt it her duty to disclose this to Mr. Moss, who she had been led to believe represented her husband, and Moss in turn disclosed it to the attorneys for Fenner, the accused. The petition states that her husband had been killed while committing another robbery in Virginia. Her affidavit gives the details of this alleged confession; names "Kid" (Lee) Mickelboro as the accomplice who drove the car and stayed outside of the bank while the robbery was being committed; and that he told her they (with Chappelle, another of the affiants)

were planning to rob banks at Centreville, Md., and Dover, Delaware. This affidavit is in some respects obscure and inconsistent, in all respects remarkable, and conflicts in some particulars with those of some of the other affiants whose affidavits were also filed in support of the same motion. Mrs. Johnstone says (regretfully it seems) that all she got out of it was one new dollar bill. Ada Chappelle told her that the only thing she got out of it was a brown coat and a two and one-half dollar gold piece which Fay Green dropped or lost, while Mrs. Johnstone told Ada Chappelle that that was more than she (Mrs. Johnstone) got out of it—referring to the money of which the Chester bank had been robbed. Mrs. Henderson, however, said in her affidavit that when Mr. Johnstone came in, after being away all day, he gave Mrs. Johnstone a handful of gold. "Four persons in my house saw it, and Mr. Johnstone told my little boy, Willie, that he (Johnstone) had $350.00 in gold. (It is observed that Miss Martha Vaughan, the clerk in the bank, had stated in her testimony that one of the robbers referred to the other as Jimmy Johnson. It also appears that Johnson was the name which had been applied to Fenner by some, including Mrs. Crowder's son, while he was at Mrs. Crowder's house at Norfolk just before he was arrested.)

Another of the affidavits is made by an officer named Johnson, to the effect that one of the Commonwealth's witnesses, Smith, who testified that he had seen Fenner on a public highway in Mecklenburg county on or about December 23rd, failed to recognize Fenner when he was in the Richmond city jail while he (Johnson), as deputy sergeant of Richmond, was making an effort to identify Fenner. If this be true, Fenner then knew before his trial of Smith's previous failure to identify him, and so when confronted by Smith on the witness

stand with this occurrence, he could have secured the testimony of this affiant, if material. There is nothing to support his claim that he could not have secured this evidence and offered it at the trial.

We do not think it important to add to this incomplete recital. The chief basis of the motion is the two affidavits of Mrs. Johnstone, to whom she says her deceased husband made the confession, supplemented by that of Chappelle who she shows was one of a criminal gang. The other affidavits are introduced by way of support as to circumstances which are deemed material. Except as to Mrs. Johnstone, whose hope of sharing the loot vanished with Johnstone's death, it does not clearly appear that all of these affiants might not have been procured as witnesses had proper diligence been exercised.

In considering this motion, it is and should be borne in mind that Fenner was positively identified by three reputable witnesses who had no doubt of his identity, two of whom were in the bank at the time of the robbery and the other of whom, the postmaster, Graves, saw him in the village the day before the robbery and crossing the street going in the direction of the bank on the day of the robbery. In view of this credible evidence of identification, there is no reason to suppose that the belated and somewhat unusual statement of Mrs. Johnstone that her husband, even while contemplating other robberies, confessed that he robbed the Chester bank, had it been secured in advance of the trial, would or should have changed the result. Her testimony would probably have been discredited because of her criminal associations and degrading environment, as well as because of its improbability.

The trial court, in its order, thus states the reasons for overruling the motion: "* * it appearing to the

court that upon the trial of the prisoner, two witnesses, namely, John I. Ellison and W. F. Saunders, positively identified the prisoner as being one of the men actually engaged in the robbery of the bank at the time charged in the indictment, and as the man who presented the pistol at them and caused them to hold up their hands; that said John I. Ellison positively identified the prisoner as having appeared in the bank on the day next previous to the day of the robbery and had money changed; and that C. B. Graves, postmaster, one of the witnesses, positively identified the prisoner as the man whom he saw on the street the day before the robbery, near said bank in the village of Chester, and the man who came into the post office at Chester on the said day of the robbery and purchased a number of envelopes, and for other legal reasons, the court overruled said motion of the prisoner.''

The court's refusal to set aside the verdict upon this ground is without error.

 The third assignment of error requires most careful consideration. A Mrs. Crowder was the chief witness upon whom the accused relied to establish his alibi. The witness, Nowitzky, had testified that he knew her general reputation for truth and veracity; that it was bad, and that he would not believe her on oath. He was then asked what was Mrs. Crowder's reputation as being a woman of immoral character, and upon exception at first the witness was not allowed to answer that question. The prosecuting attorney contended that although she had been asked that question and had replied that she had not been accused of being a woman of immoral reputation, he was nevertheless within his rights to prove by the witness, Nowitzky, her general reputation as to immoral character;

and when this question was repeated the court permitted the witness to answer it.

These cases are relied on to support this assignment of error: *Uhl's Case*, 6 Gratt. (47 Va.) 706; *Allen* v. *Commonwealth*, 122 Va. 841, 94 S. E. 783; *Beavers* v. *Commonwealth*, 147 Va. 585, 136 S. E. 501. They however are cases in which it was sought to contradict a witness and impeach him by proving irrelevant independent facts, or the commission of other crimes. Here the question and answer refer, not to specific facts, conduct or crimes, but to general reputation.

Mr. Greenleaf says: "In general, the rule is that upon examination to try the credit of the witness only general questions can be put; and he cannot be asked as to any collateral independent fact merely with a view to contradict him afterwards by calling another witness. And only general questions can be put." Greenleaf on Evidence, 455.

The question raised is thus clearly treated in the note to *Lodge* v. *State* (122 Ala. 97, 26 So. 210), 82 Am. St. Rep. 29: "There is a marked conflict of authority on the question as to whether, in proving character, the party is limited to the witness' character for truth and veracity, or whether he can show what his general moral character is. There is no doubt that his general reputation for truth and veracity may be shown, for this goes directly to discredit his testimony. And many of the cases, such as *State* v. *Burpee*, 65 Vt. 1, 25 Atl. 964, 36 Am. St. Rep. 775, go no further than to state that a witness' general reputation for truth and veracity may be proved. In a number of jurisdictions, however, the rule is well settled that, in proving the general reputation of a witness, the evidence should be limited to showing his reputation for truth and veracity, and that it is improper to allow inquiries relative to

his general moral character: *Rudsdill* v. *Slingerland*,
18 Minn. 380 [Gil. 342.]; *People* v. *Abbott*, 97 Mich.
484, 56 N. W. 862, 37 Am. St. Rep. 360; *State* v. *Randolph*, 24 Conn. 363; *Atwood* v. *Impson*, 20 N. J. Eq.
150; *Phillips* v. *Kingfield*, 19 Me. 375, 36 Am. Dec.
760; *Crane* v. *Thayer*, 18 Vt. 162, 46 Am. Dec. 142;
*Ayres* v. *Duprey*, 27 Tex. 593, 86 Am. Dec. 657; *Dimick*
v. *Downs*, 82 Ill. 570; *Smith* v. *State*, 58 Miss. 867;
*Bakeman* v. *Rose*, 14 Wend. [N. Y.] 110; *Quinsigamond
Bank* v. *Hobbs*, 11 Gray [Mass.] 250; *Ketchingman* v.
*State*, 6 Wis. 426; *State* v. *Smith*, 7 Vt. 141. In *Rudsdill*
v. *Slingerland*, 18 Minn. 380 [Gil. 342], it was said that
the only object in inquiring into the character of a
witness was for the purpose of ascertaining whether he
was a truthful person or not. And for this reason
inquiries concerning his general reputation should be
confined to his reputation for truth and veracity.

"In fully as many jurisdictions the rule is equally
well established that you may not only inquire as to a
witness' reputation for truth and veracity, but his
general moral character may be shown. A witness'
whole moral character may be attacked, and a party is
not limited to showing his bad reputation for truth and
veracity: *Gilliam* v. *State*, 1 Head [Tenn.] 38, 73 Am.
Dec. 161; *State* v. *Shields*, 13 Mo. 236, 53 Am. Dec. 147;
*Mitchell* v. *State*, 94 Ala. 68, 10 South. 518; *Holland* v.
*Barnes*, 53 Ala. 83, 25 Am. Rep. 595; *Evans* v. *Smith*,
5 T. B. Mon. [Ky.] 363, 17 Am. Dec. 74; *State* v. *Clinton*, 67 Mo. 380, 29 Am. Rep. 506; *State* v. *Shroyer*,
104 Mo. 441, 16 S. W. 286, 24 Am. St. Rep. 344;
*Birmingham Union Ry. Co.* v. *Hale*, 90 Ala. 8, 8 South.
142, 24 Am. St. Rep. 748; *State* v. *May*, 142 Mo. 135,
43 S. W. 637; *People* v. *Bentley*, 77 Cal. 7, 18 Pac. 799;
11 Am. St. Rep. 225; *People* v. *Prather*, 120 Cal. 660,
53 Pac. 259; *People* v. *Silva*, 121 Cal. 668, 54 Pac. 146.

"In several of the States the rule has been established by statute that the credibility of a witness may be impeached by proof of his general moral character; *Kilburn* v. *Mullen*, 22 Iowa 498; *State* v. *Froelick*, 70 Iowa 213, 30 N. W. 487; *Morrison* v. *State*, 76 Ind. 335; *Majors* v. *State*, 29 Ark. 112; *Cline* v. *State*, 51 Ark. 140, 10 S. W. 225; *People* v. *Bentley*, 77 Cal. 7, 18 Pac. 799, 11 Am. St. Rep. 225. In Utah, however, under a statute allowing the credibility of a witness to be drawn in question by evidence affecting his character 'for truth, honesty, or integrity,' it was held that the general reputation of a witness for ·honesty and integrity could not be attacked unless such reputation was in issue, and that for ordinary purposes of impeachment the inquiry must be limited to his general reputation for truth and veracity: *State* v. *Marks*, 16 Utah 204, 51 Pac. 1089. Even in those jurisdictions where the general moral character of a witness may be inquired into, the inquiry cannot extend to show the cause producing the bad character. *Holland* v. *Barnes*, 53 Ala. 83, 25 Am. Rep. 595. Hence where a defendant, who is an attorney, is cross-examined to show that he was disbarred, evidence as to the reasons for the disbarment is properly excluded. *People* v. *Dorthy*, 50 App. Div. 44, 63 N. Y. Supp. 592.

"This would amount to an investigation as to particular acts of misconduct. And the authorities are quite uniform in holding that the character of a witness cannot be impeached by proof of particular acts of immorality or wrongdoings."

*McQuiggan* v. *Ladd*, 79 Vt. 90, 64 Atl. 503, 14 L. R. A. (N. S.) 697, note.

The view prevailing in this State upon this question is thus indicated in *Cutchin* v. *Roanoke*, 113 Va. 473, 74 S. E. 407: "In order to impeach this testimony,

witnesses were offered to prove her reputation for chastity, but the court declined to allow the defendant to introduce proof along that line.

"In *Langhorne's Case*, 76 Va. 1012, it was held that it was not permissible to ask a witness if he had not been convicted of an offense which did not involve his character for truth on oath.

"And in *Uhl's Case*, 6 Gratt. (47 Va.) 706, it was held that the record of the conviction of a witness for petty larceny in another State is not admissible evidence to impeach the veracity of the witness. And it was further held that a party seeking to impeach a witness will not be allowed to ask what the general character of the witness is in relation to other matters, as well as to his veracity.

"Any other rule would involve the court in an endless investigation of matters wholly collateral to the issue under trial."

It may be observed that the instant case has this distinguishing feature: Here it had been already shown that Mrs. Crowder's reputation for truth and veracity was bad, and that she could not be believed on oath. There was no contradiction of this impeachment. Assuming this to be a fact proved in this case, the remarks of the Florida court in the case of *Butler* v. *State*, 94 Fla. 163, 113 So. 701, are worthy of repetition: "Technical error, committed by a trial court in the reception or rejection of evidence, does not necessarily constitute harmful error. It is *injury* resulting from error that warrants an appellate court in reversing a judgment of the trial court. A judgment of conviction will not ordinarily be reversed, even if technical errors were committed in rulings on the admissibility of evidence, where the evidence of guilt is ample and no fundamental rights of the accused have been infringed. *Chesser* v.

*State*, 85 Fla. 151, 95 So. 610; *Linsley* v. *State*, 88 Fla. 135, 101 So. 273. We fully appreciate the extreme delicacy of duty involved in a pronouncement by an appellate court that testimony, the admission of which might be technical error, was nevertheless not harmful or prejudicial to the substantial rights of the defendant. In view, however, of the abundancy of evidence to support the verdict and judgment, we feel that our conclusion in this case that the error, if any, in admitting the questioned testimony, was at most only technical and did not affect the result, is not an injudicious application of doctrine of harmless error under the statute."

Our judgment is that the question should not have been permitted, but we do not think the case should be reversed because of this error.

■■■■ It is moreover contended for the Commonwealth in this case that this particular evidence was admissible as affecting her credibility because tending to substantiate her probable intimacy with the accused and her bias in his favor. She had stated that she was a widow, had a son eighteen years of age, who she testified was her main support, but whose occupation she did not give, though she said he was working on a ship at the time of the trial. She had only one other boarder, a man who was in Washington at the time of Fenner's arrest. She testified that Fenner had been boarding at her house since May and was in and about the house in the day as well as at night. He was apparently without regular occupation. In accounting for Fenner's whereabouts on December 21st, the day of the robbery, she said he had been about the house nearly all day, and that evening Mr. Shaffer came in and brought her a Christmas present and that later Fenner had driven her and another woman whose name

she gave to a hotel to meet an engagement to dine with two men from North Carolina, both of whom she acknowledged she knew were married. Mrs. Crowder also admitted that she thought she had met one of these men at the same place once before. The accused first telephoned after his arrest to this witness, Mrs. Crowder, whom he called "Annie," and she hurried to jail and appeared solicitous about his arrest.

This is the substance of the testimony of two witnesses for the Commonwealth, officers, who concealed themselves in the jail so near that they overheard their conversation: One of them testified that Fenner told her that they were holding him for this robbery, and that he wanted her to get Preacher, or Prichard, and Agnes to remember that he was on a party on the night of December 21st; that some other names were called besides Preacher, or Prichard, and Agnes, but they could not give these other names, and he told her to remember that he was on a party that night, the night of the 21st. The other officer detailed the substance of this conversation thus: "She says: 'What is the trouble, Bob?' He said: 'They have got me for a bank robbery in Chesterfield at Chester,' and she said: 'I don't see why they don't let you alone. Just because you have been in trouble a couple of times they hound you to death.' Then they talked low a few minutes and finally I heard him say to tell Agnes and a fellow named Preacher and named two or three other people, that 'I was with them on a party on the 21st of December.'

"Q. Now are you relating exactly what they said: 'You tell Preacher and Agnes' and named one or two other parties, 'that I was with them on a party on the 21st'?

"A. Yes, sir."

There is strong confirmation of this in this account of that conversation given by the witness, Mrs. Crowder:

"Q. Mrs. Crowder, did you go down to the jail after Mr. Fenner was arrested?

"A. Yes, sir.

"Q. It has been testified that Mr. Fenner told you to tell Preacher and Agnes that 'I was with them on a party on the 21st.' State what, if anything, was said in reference to that.

"A. When I walked in—he 'phoned for me to come down—he threw a paper in my face and I was so thoroughly surprised—

"Q. What paper?

"A. The description and his face—picture of him in jail, or recited something like that.

"Q. The newspaper?

"A. Yes, sir. And I said to him: 'Gracious, where did you get that?' He said: 'They have got me for the bank robbery in Chester, Va.' I said: 'You know you didn't do it.' He said: 'No, I had Agnes and Preacher off on a party.' I said: 'No you didn't; you were with me and you didn't have them.' That is all that was said except I contradicted him because I knew he was positively with me at the time and he didn't know himself why he was arrested; he had no idea why they came there to take him there that day."

The identity of the persons referred to as "Agnes" and "Preacher" is not disclosed, but in another connection Mrs. Crowder refers to Agnes Davis as one who frequented her home, assisting in the care of her infant grand-child.

Based upon these circumstances, it is claimed that the purpose of the prosecuting attorney in asking the question was to enlighten the jury as to the relationship

existing between the accused and Mrs. Crowder. It is contended that it was entirely proper to establish that she was not a woman of good reputation and to infer therefrom illicit intimacy with Fenner and her consequent bais in his favor. It is argued that this must have been the ground upon which the evidence was allowed by the court, because the court at once excluded the next question asked of the same witness, Nowitzky, as to her being a frequenter of houses of prostitution and assignation.

It is contended, then, that the question and answer here objected to were allowable as tending to show intimacy of Fenner with Mrs. Crowder, and thus accounting for her interest in the case. Of course, it would clearly have been proper to show the bias of the witness, Mrs. Crowder. In this case the only issue the jury had to determine was the conflict of evidence between those witnesses for the prosecution who positively identified the accused as one of the robbers of the bank, on the one hand, and Mrs. Crowder with two others for the accused who testified that he was in Norfolk at the hour of the robbery, on the other. It certainly was important that any bias of any of the witnesses should be shown, and if shown it was proper matter for consideration of the jury in determining the conflict in the evidence. Whether this bias could be shown in this indirect way is questionable.

As has been already stated, the accused had not only been fully and positively identified as one of the robbers, but after his arrest and while on the way from Norfolk to Richmond, A. T. Traylor, chief of police of Chesterfield county, asked him: "Robert, that stuff was pretty heavy you had to take out of there, wasn't it?" and he replied: "Yes, it was; but I had to carry it out if it weighed a ton." Then Traylor said: "Right

much silver," to which the accused made no reply. Then the witness, Ellison, upon the same journey, remembered Fenner's asking Mr. Traylor if they thought they would capture any of the rest of the fellows, and he also said he would like to see the rest of the fellows and hear what they had to say when they read the newspapers. This incriminating evidence introduced by the Commonwealth was neither contradicted nor denied.

It was also evident from Mrs. Crowder's own admissions that some of her conduct was so questionable that her reputation as a virtuous woman must have been bad, so that the answer to the question only confirmed a fact which was already evident from her own testimony. While a different verdict might have been returned, we do not think, because of the admitted facts, that any other verdict should have been rendered.

■ The fourth assignment of error arises out of these circumstances: The witness, Mrs. Crowder, had testified as to her whereabouts during the week of December 21st, particularly that she had gone with another woman to a hotel to dine with two gentlemen from North Carolina. The prosecuting attorney first, and then the attorney for the accused, in testing the accuracy of her memory, had asked her where Fenner was on other days of the week, among other days, December 23rd, and she had testified that he was at her home practically all of that day. G. W. Smith, introduced by the Commonwealth, testified that he had seen Fenner at Boykin (probably Boydton, Mecklenburg county) on December 23rd, and this is so far away from Norfolk that if Smith's statement be true, Mrs. Crowder's was untrue. The admission of this testimony of Smith is assigned as error, as being an attack upon the credibility of the witness. The reply to this is that

it was not an attack upon the credibility of the witness as necessarily imputing intentional falsity, but it was intended to test the accuracy of her memory concerning the events which happened at or near the time of the robbery. If the fact was irrelevant and collateral to the issue, then it could not be contradicted. *Norfolk, etc., R. Co.* v. *Carr*, 106 Va. 513, 56 S. E. 276; *Allen* v. *Commonwealth*, 122 Va. 834, 94 S. E. 783.

 We are unable to say, under the facts of this case, that Fenner's precise whereabouts out of Norfolk two days after the robbery, which occurred approximately one hundred miles away from Norfolk, was matter entirely irrelevant to the issue. The witness for the accused, without objection, undertook to account for his continuous presence in Norfolk for several days both before and after the day of the robbery, and if this evidence was relevant for the purpose of supporting the alibi on the precise date of the robbery, we cannot say that this contradictory testimony tending to destroy it was irrelevant. The alibi was the vital question, and there is no reason to suppose that the jury misunderstood the chief issue which was so clearly presented to them.

 The fifth assignment of error arises thus: Among the witnesses introduced to prove the presence of the accused in Norfolk on the date of the robbery were two boys, who testified that they were at a certain house on the afternoon of December 21st, and saw Fenner, the accused, there at about a quarter to eight o'clock. It is observed that he might have been there at that hour, though also at Chester at three o'clock, and this is clearly shown by the evidence. They also testified that after the return of two ladies who had been to a moving picture show, they told these ladies that the accused had been there to see them. There-

after they were offered as witnesses to testify that Goodwin and Torbert had told them of this fact. The court excluded the testimony of these two ladies, and this is made the ground of exception.

It is conceded that as a general rule evidence such as this cannot be received as corroborative of testimony which has neither been attacked as a recent fabrication nor otherwise. There is an exception to the general rule when a design to misrepresent from some motive of interest or relationship is imputed to a witness, for in such cases, in order to repel such imputation, it is proper in some instances to show that the witness made a similar statement at a time when the imputed motive did not exist. *Howard* v. *Commonwealth*, 81 Va. 489; *Jessie* v. *Commonwealth*, 112 Va. 887, 71 S. E. 612. There was, however, no imputation upon these boys. Their testimony was not objected to, and was before the jury for consideration. There was no error in refusing to admit the evidence of the two ladies as to what these boys had said to them. The boys had already testified to the jury as to the same circumstance, and that they had also said it to these two ladies who were tendered as witnesses is immaterial. The ruling was correct.

The instructions to the jury, with one exception, which has been referred to in this opinion, were strictly correct, and the evidence upon which the verdict is based is clear, positive and direct. There is not the slightest reason to suppose that any jury having this evidence, as well as all the additional evidence which the accused claims now to be able to offer, would or should reach any different conclusion, and we are, therefore, of opinion to affirm the judgment.

*Affirmed.*