COURT OF APPEALS OF VIRGINIA


Present: Judges Benton, Bray and Bumgardner
Argued at Salem, Virginia


MARK ANTHONY GRAHAM
                                            OPINION BY
v.   Record No. 2154-98-3      JUDGE RUDOLPH BUMGARDNER, III
                                         MARCH 7, 2000
COMMONWEALTH OF VIRGINIA


           FROM THE CIRCUIT COURT OF TAZEWELL COUNTY
                    Donald R. Mullins, Judge

           James R. Henderson IV (Henderson and
           DeCourcy, on brief), for appellant.

           John H. McLees, Jr., Assistant Attorney
           General (Mark L. Earley, Attorney General, on
           brief), for appellee.


     A Tazewell County jury convicted Mark Anthony Graham of

statutory burglary, grand larceny of a firearm, shooting into an

occupied building, and possession of a firearm after being

convicted of a felony.  He was acquitted of four other felonies:

aggravated malicious wounding, attempted malicious wounding, use

of a firearm in the commission of aggravated malicious wounding

and use of a firearm in the commission of attempted malicious

wounding.  On appeal, the defendant argues the trial court erred

(1) by refusing his instruction on heat of passion, (2) by

refusing his instruction on the burden of proving affirmative

defenses, (3) by denying his motion for a continuance, (4) by

shackling him during trial, and (5) by holding the hearing on whether to shackle in his absence.  Finding no error, we affirm.

The events all occurred in the Hash Hollow area of Tazewell County.  Swanson and Linda Mullins lived in a house along the public road at the mouth of the narrow, fairly steep hollow.  Approximately 200 to 300 feet behind them, their daughter, Pam, and her husband, Doug Gates, lived in a trailer.  One hundred seventy-five yards farther up the hollow, Steven and Tammy Hash lived in their trailer.  The ground between the trailers was open, but woods and a creek ran along the right side of the hollow.

The defendant arrived unannounced at the Gateses' trailer and stated that he wanted to stay there.  Doug Gates was the defendant's uncle, but Gates told him he could not stay because the police had been there several times looking for him.  They told the defendant to leave, and when he would not, Doug Gates called Swanson Mullins at his home.  He asked Mullins to call the sheriff or to send someone to help get rid of the defendant.  The defendant retrieved a shotgun from a bedroom and pointed it at Gates's face.  Gates knocked the gun away, they scuffled, but the defendant left.  Two or three minutes later, bullets started hitting the trailer.

Several people were at the Mullinses' house when Gates called.  One of them, Donald Keene, went to investigate.  As he entered the Gateses' trailer, "someone started shooting through

the trailer," breaking a window, and piercing the exterior. Everyone in the trailer took cover while Gates again called Mullins for help. Keene found a shotgun and shells, went outside, and took cover behind a cinder block wall located a few feet from the Gateses' trailer. Keene heard the defendant hollering from the woods and saw him move from the woods toward the Hashes' trailer.

After receiving Gates's first call for help, Mullins got his pistol and went to the trailer to check on them. On his way, he heard the defendant call his name from the vicinity of the Hashes' trailer. After checking at the trailer, Mullins returned to his house, got his rifle, and went into the woods heading towards the Hashes' trailer. His son and a friend, who were also armed, went with him.

When the call came to the Mullinses' house, Lewis Collins grabbed a shotgun and made his way to a utility pole near the Gateses' trailer. While there, Collins was shot in the shoulder and stomach with double aught buckshot. He yelled to the defendant that he had been hit and to stop shooting before someone else got hurt. The defendant responded that he was not going to give up. Collins moved to better cover behind the cinder block wall where Keene was hiding.

During the episode, the defendant called Mullins's name from the vicinity of the Hashes' trailer and said, "I've come to die this time." The defendant hollered that he could see

Mullins "real good."  The shooting did not stop until sheriff's deputies arrived and took charge.  They found that numerous bullets and buckshot penetrated the trailer on the side that faced the Hashes' trailer.  They also determined that numerous shots hit the cinder block wall but particularly around the vent window which Keene used as his vantage point.  They found no gunshot damage to the Hash trailer.

The defendant testified about the incident.  A few days before, he had argued with Mullins after telling him that Gates had abused him as a child.  Mullins threatened to kill the defendant for "talking trash."  Because he was wanted for a probation violation, the defendant had been living in his car.  He went to the Gateses' trailer to take a shower and do laundry.  While doing so, Gates touched the defendant's behind, and they began arguing.  Gates telephoned Mullins telling him to send some armed men to the trailer.  The defendant then grabbed a gun from the bedroom, pretended it was loaded, and pointed it in Gates's face.  They wrestled until the defendant told Gates to let him go.  When Gates did, the defendant left the trailer.  As he left, he did not see anyone coming from the Mullinses' house.

The defendant walked up the hollow to get away without going past the Mullinses' house.  Halfway to the Hashes' trailer, he saw four armed men, including Mullins and Collins, walking toward him.  Two men seemed to be coming around each side of the Gateses' trailer.  He turned to continue running up

the hollow.  When he reached the Hashes' trailer, he decided to get help there.  As he went by the window to the utility room he saw guns and burst through the window.  He did not know whether anyone was home and did not see a car there.  He broke through the window without ever going to the door or calling out to anyone for help.  The defendant armed himself with a shotgun and a .22 caliber rifle, found the ammunition kept at the other end of the trailer, and went back outside.

The defendant saw three men down the hollow near the Gateses' trailer, and he fired shots in the air to warn them that he was armed.  He ran back into the trailer and fired more shots into the air.  The defendant started aiming at the Gateses' trailer after the others started shooting back.  Eventually the defendant ran low on ammunition.  He left the trailer and worked his way up the hollow and across the mountain.  He went to North Carolina and turned himself in six days later to the Pulaski sheriff's office.

The trial court refused two defense instructions.  The first[1] would have instructed the jury that they could not find

---

[1] Defense Instruction No. 17A provides:

> Malice is that state of mind which
> results in the intentional doing of a
> wrongful act to another without legal excuse
> or justification, at a time when the mind of
> the actor is under the control of reason.
> Malice may result from any unlawful or
> unjustifiable motive including anger,
> hatred, or revenge.  Malice may be inferred

that the defendant acted with malice if they found he acted in a

heat of passion upon reasonable provocation.  The trial court

gave the first paragraph of the instruction which defined

malice.  The defendant was acquitted of the primary charges that

contained the element, malice:  aggravated malicious wounding of

Lewis Collins, attempted malicious wounding of Donald Keene, use

of a firearm in the commission of aggravated malicious wounding,

and use of a firearm in the commission of attempted malicious

wounding.  The issue is moot as to those offenses.

Only the conviction of shooting into an occupied dwelling

required a finding of malice.  When considering whether a trial

court erred in refusing to give a proffered instruction, "we

view the evidence with respect to the refused instruction in the

light most favorable to the defendant."  <u>Boone v. Commonwealth</u>,

---

from any deliberate willful and cruel act
against another, however sudden.
     Heat of passion excludes malice when
the heat of passion arises from provocation
that reasonably produces an emotional state
of mind such as hot blood, or rage, anger,
resentment, terror or fear so as to cause
one to act on impulse without conscious
reflection.  Heat of passion must be
determined from circumstances as they
appeared to defendant but those
circumstances must be such as would have
aroused heat of passion in a reasonable
person.
     If a person acts upon reflection or
deliberation, or after his passion has
cooled or there has been a reasonable time
or opportunity for cooling, then the act is
not attributable to heat of passion.

14 Va. App. 130, 131, 415 S.E.2d 250, 251 (1992).  Viewed in that manner, the facts do not support a defense that the defendant acted in a heat of passion when he fired into the Gateses' trailer.

After the defendant left the Gateses' trailer, he was halfway to the Hashes' trailer before he saw anyone.  Instead of continuing his escape up the mountain, he broke through the trailer window when he saw weapons inside.  Arming himself and finding ammunition, he went outside.  The men he saw were near the Gateses' trailer, a distance of about 175 yards; no one was coming up the hill, and no shots had been fired.  The defendant fired warning shots but yelled that he "didn't have a problem with them."  He went back into the trailer and resumed firing while dodging from window to window to avoid detection.  He aimed shots at the Gateses' trailer and the wall after shots were fired from that direction.

"'Heat of passion' refers to 'the furor brevis which renders a man deaf to the voice of reason.'  An accused must show that he committed the crime with 'passion' and upon 'reasonable provocation.'"  Caudill v. Commonwealth, 27 Va. App. 81, 85, 497 S.E.2d 513, 514-15 (1998) (citations omitted).  The law requires the simultaneous occurrence of both reasonable provocation and passion.  See Canipe v. Commonwealth, 25 Va. App. 629, 643, 491 S.E.2d 747, 753 (1997).

Heat of passion excludes malice when provocation reasonably produces fear that causes one to act on impulse without conscious reflection.  By his own testimony, the defendant consciously abandoned his escape, armed himself, and started shooting.  He did so before any other shots were fired or any words exchanged.  Mullins's threat was made two days earlier and not at the time of the incident.  The defendant did not act on sudden provocation or from passion.  He acted upon reflection and deliberation.  We find the evidence insufficient as a matter of law to justify a heat of passion instruction.

The trial court refused a second defense instruction.[2]  It would have instructed that affirmative defenses need only be proved sufficiently to raise a reasonable doubt.  The defendant asserted two affirmative defenses, self-defense and duress.  The defendant was acquitted of the crimes against which self-defense applied:  aggravated malicious wounding of Lewis Collins, attempted malicious wounding of Donald Keene, use of a firearm in the commission of aggravated malicious wounding and use of a

---

[2] Defense Instruction No. 28A provides:

> The defendant need not prove his affirmative defenses beyond a reasonable doubt, or even by a preponderance of the evidence.  The defendant must only introduce sufficient evidence which, when considered with the whole evidence, creates a reasonable doubt regarding his guilt.

firearm in the commission of attempted malicious wounding.  The issue is moot as to those offenses.

Self-defense excuses or justifies a homicide or assault committed while repelling violence arrayed against the defendant.  It is a response to the threat of death or serious bodily harm.  It is a defense to an act of violence that repels violence directed at the defendant.  The right to use force to defend against death or serious bodily harm cannot excuse or justify a burglary or larceny.

> "Homicide in defense of person or property, under certain circumstances of necessity; which is justifiable by the permission of the law.  This takes place when a man, in defense of his person, habitation or property, kills another, who manifestly intends and endeavors, by violence or surprise, to commit a forcible or atrocious felony upon either.  In the cases to which this ground of justification applies, no felony has been committed, but only attempted; and the homicide is justifiable in order to prevent it.

> "All felonies may not be so prevented. A distinction is made between such felonies as are attended with force, or any extraordinary degree of atrocity, which in their nature betoken such urgent necessity as will not allow of any delay, and others of a different kind and unaccompanied by violence on the part of the felon.  Those only which come within the former description may be prevented by homicide; as murder, rape, robbery, arson, burglary and the like.  In the attempt to commit either of these, the <u>party whose person or property</u> is attacked is not obliged to retreat, but may pursue his adversary until he has secured himself from all danger, and if he

> kill him in so doing, it is called
> justifiable self-defense."

Dodson v. Commonwealth, 159 Va. 976, 980-81, 167 S.E. 260, 261, (1933) (citation omitted).

The efforts of the defendant to obtain weapons with which to defend himself are relevant to explain why he broke in the Hashes' trailer and took the guns. Those facts tend to negate the existence of the intent necessary to establish burglary or larceny. They showed the defendant broke into the trailer to defend himself, not to commit a felony. They showed he took the guns as a means of protecting himself, not to steal them. In the sense that those facts refute the Commonwealth's evidence of guilt, the jury was adequately instructed in applying the facts to the law.

The first instruction that the trial court gave provided, "There is no burden on the defendant to produce any evidence."[3]

---

[3] The entire Instruction No. 1 reads as follows:

> The defendant is presumed to be innocent. You should not assume the defendant is guilty because he has been charged and is on trial. This presumption of innocence remains with the defendant throughout trial and is enough to require you to find the defendant not guilty unless and until the Commonwealth proves each and every element of the offense beyond a reasonable doubt. This does not require proof beyond all possible doubt, nor is the Commonwealth required to disprove every conceivable circumstance of innocence. However, suspicion or probability of guilt is not enough for a conviction.

See Russell v. Commonwealth, 216 Va. 833, 837, 223 S.E.2d 877, 879 (1976) (approving instruction).  This Court has discouraged attempts to further define reasonable doubt and the burden of proof.  See Blaylock v. Commonwealth, 26 Va. App. 579, 598-99, 496 S.E.2d 97, 106-07 (1998) (where court gave alibi instruction, no error to deny instruction explaining burden to prove defense); Diffendal v. Commonwealth, 8 Va. App. 417, 423, 382 S.E.2d 24, 26-27 (1989) (proper to refuse instructions which are misleading or redundant).

The affirmative defense of self-defense is similar to the alibi defense; it only requires the defendant to raise a reasonable doubt as to his guilt.  See McGhee v. Commonwealth, 219 Va. 560, 562, 248 S.E.2d 808, 810 (1978); Lynn v. Commonwealth, 27 Va. App. 336, 352, 499 S.E.2d 1, 9 (1998), aff'd, 257 Va. 239, 514 S.E.2d 147 (1999).  As such, the defendant has no burden to prove the defense or negate an element of the crime.  See Charles E. Friend, The Law of Evidence in Virginia § 9-11, 342 (4th ed. 1993).  The instructions given defined the elements of proof and the burden of proof.  We find no error in the trial court's refusing to give the additional instruction on the burden of proving

---

There is no burden on the defendant to produce any evidence.
A reasonable doubt is a doubt based on your sound judgment after a full and impartial consideration of all the evidence in the case.

affirmative defenses.  Where a refused instruction is covered in another instruction there is no error.  See Williams v. Commonwealth, 228 Va. 347, 349, 323 S.E.2d 73, 74 (1984).

The defendant raised a second affirmative defense, duress. Duress excuses criminal behavior "where the defendant shows that the acts were the product of threats inducing a reasonable fear of immediate death or serious bodily injury."  Pancoast v. Commonwealth, 2 Va. App. 28, 33, 340 S.E.2d 833, 836 (1986) (citing United States v. Bailey, 444 U.S. 394, 409 (1980)). Where the defendant fails "to take advantage of a reasonable opportunity to escape, or of a reasonable opportunity to avoid doing the acts without being harmed, he may not rely on duress as a defense."  Id. (citations omitted).  The defendant must show that the threat, which is "specifically directed toward causing [him] to commit the crime charged," was coupled with evidence that he "reasonably believed that participation in the crime was the only way to avoid the threatened harm."  Roger D. Groot, Criminal Offenses and Defenses 181 (4th ed. 1999) (citing Sam v. Commonwealth, 13 Va. App. 312, 324, 411 S.E.2d 832, 838 (1991)).

Again viewing the evidence in the light most favorable to the defendant, we find the evidence insufficient to establish duress.  The defendant refused to leave the Gateses' trailer and knew that Gates telephoned Mullins for help.  The defendant was halfway up the hollow when he saw four armed men coming around

the Gateses' trailer. The defendant was fleeing, and he was familiar with the area and knew his way around the woods. He consciously quit his escape, elected to remain, and armed himself by breaking in the Hashes' trailer. The defendant did not take advantage of the alternative to his criminal conduct. Indeed, he abandoned it and took up the fray. Because the defendant is not entitled to rely on the defense of duress, he is not entitled to complain that the trial court failed to instruct on the burden of proving the defense.

The defendant contends the trial court erred in the conduct of the trial proceedings. First, he argues that the trial court erred in denying a continuance made the morning of trial. The defendant moved for the continuance because he did not get enough sleep to be adequately prepared. The trial court had ordered the defendant moved from Keen Mountain Correctional Center to the county jail as an accommodation for trial preparation. However, the day before trial, the sheriff returned the defendant to the correctional center. He arrived there at 3:00 p.m. but did not go to bed until around 11:00 p.m. He was awakened after 1:00 a.m. and returned to jail arriving at 5:30 a.m. The defendant did not rest after he arrived at the jail. He contended he was unprepared to assist with his defense because of a lack of rest. The trial court denied the motion but delayed the trial an hour to allow defendant to confer with his attorney.

The defendant's trial had been continued on five previous occasions. The trial court stated:

> this defendant has jerked the Court around
> for a number of times indicating that he was
> going to go ahead and enter pleas of guilty
> to these charges, or certain charges, and
> would get right up until the scheduled time
> for entering those pleas and he would change
> his mind and have to be taken back to the
> penitentiary and so forth . . . .

The trial court had entered eight transportation orders for the defendant and had allowed him to stay in the jail for periods of thirty days to facilitate his trial preparation. The correctional center was 35 to 40 miles from the jail. The trial court had granted the defendant previous continuances to permit additional preparation.

"The decision whether to grant a continuance is within the sound discretion of the trial court. Abuse of discretion and prejudice to the complaining party are essential to reversal." Lowery v. Commonwealth, 9 Va. App. 304, 307, 387 S.E.2d 508, 509 (1990) (citations omitted). See also Cardwell v. Commonwealth, 248 Va. 501, 509, 450 S.E.2d 146, 151 (1994), cert. denied, 514 U.S. 1097 (1995).

The evidence does not support the defendant's allegation that the court abused its discretion. The evidence does not show, and the defendant does not allege, that he was prejudiced by the court's denial of his motion. The record reflects that the defendant testified that morning at a suppression hearing,

and his testimony was clear, coherent, and responsive.  The record does not reflect that the defendant was not fully able to assist in his defense.  Indeed, the defendant was acquitted of four felonies.  We conclude the trial court did not abuse its discretion by refusing to continue the trial.

Next we consider whether the trial court erred in shackling the defendant during the trial.  The trial court entered a preliminary order to shackle the defendant after the sheriff's department advised that the defendant had threatened to attack the Commonwealth's Attorney and some witnesses during the trial.  At a pretrial hearing, a deputy testified that he was advised to use two guards when transporting the defendant.  The defendant's psychiatrist at Keen Mountain Correctional Center had informed the sheriff's office that the defendant "was dangerous and that they had him in solitary confinement down there and . . . to use extra security on him."  They also advised that the defendant "was capable of killing someone."  The Commonwealth noted that "the defendant had made threats to disrupt the facility or cause a problem when transported to Keen Mountain [and] that did happen."  On a previous occasion, transportation officers had needed to use a shock belt to subdue the defendant.  Commendably, defense counsel, as an officer of the court, indicated that there were allegations the defendant possibly intended to disrupt the trial.

The conduct of a trial is left to the sound discretion of the trial court. See Gray v. Commonwealth, 233 Va. 313, 343-44, 356 S.E.2d 157, 174, cert. denied, 484 U.S. 873 (1987). An accused may be shackled during a jury trial "after a determination that such measures are necessary for security reasons." Seegars v. Commonwealth, 18 Va. App. 641, 646, 445 S.E.2d 720, 723 (1994) (citing Gray, 233 Va. at 343-44, 356 S.E.2d at 174). In considering whether a defendant shall be restrained, the trial court may consider "the seriousness of the charge, the defendant's temperament, age, and physical attributes, his criminal record and any . . . threatened misconduct." Frye v. Commonwealth, 231 Va. 370, 381-82, 345 S.E.2d 267, 276 (1986) (citation omitted). See Martin v. Commonwealth, 11 Va. App. 397, 406, 399 S.E.2d 623, 628 (1990) (record must support court's decision). Moreover, when a jury is not aware of the defendant's restraints, there is no constitutional violation. See Gray, 233 Va. at 343-44, 356 S.E.2d at 174.

The trial court ruled that the defendant would be shackled during trial but granted defense counsel's request to drape two sides of the defense table to prevent the jury from seeing the restraints. The defendant did not request an instruction on the use of restraints and none was given. No evidence indicates that the jury ever observed the restraints. Given the seriousness of the charges, the threatened misconduct, the prior

misconduct during transport, and the lack of evidence that the jury saw the restraints, we conclude that the trial court did not err.

The defendant was absent during the hearing on whether to shackle him.  The defendant argues that conducting the hearing in his absence was a violation of his constitutional rights under the Sixth and Fourteenth Amendments, as well as his rights under the Virginia Constitution, Article 1, Section 8, and Code § 19.2-259.[4]

A defendant has a constitutional right to be present at all stages of the trial from arraignment to sentence.  See U.S. Const. amend. VI; Code § 19.2-259; Jones v. Commonwealth, 227 Va. 425, 428, 317 S.E.2d 482, 483 (1984); Williams v. Commonwealth, 188 Va. 583, 592-93, 50 S.E.2d 407, 411-12 (1948). While this right must be carefully safeguarded, it is not absolute.  See Cruz v. Commonwealth, 24 Va. App. 454, 461, 482 S.E.2d 880, 883 (1997) (en banc) (defendant's right to be present may be forfeited).  When the hearing was conducted, the sheriff had served the indictment on the defendant, the trial court had appointed counsel, but it had not arraigned the defendant, nor had he entered a plea.  The trial had not commenced, so the hearing could not have been a stage of the trial.  See Burnley v. Commonwealth, 208 Va. 356, 362, 158

_____

[4] Code § 19.2-259 provides, in part, that "[a] person tried for felony shall be personally present during the trial."

S.E.2d 108, 112 (1967).  The defendant concedes he found no authority that a defendant's rights are violated if he is not present at a pretrial proceeding.  We conclude that the pretrial hearing was not a stage of the trial at which the defendant's presence was required.

We also conclude that the decision to shackle the defendant was not a ruling that so affected the defendant's interests that his presence was mandated.  It was an administrative proceeding to assess the security requirements at trial.  It was held six months before the trial finally commenced.  Nothing bearing on the merits of the case was discussed, considered, or decided. Compare Quintana v. Commonwealth, 224 Va. 127, 295 S.E.2d 643 (1982), cert. denied, 460 U.S. 1029 (1983) (defendant's presence not required at pretrial conference on his sanity), and Bilokur v. Commonwealth, 221 Va. 467, 270 S.E.2d 747 (1980) (defendant's presence not required at pretrial interrogation of victim by both parties), with Hunter v. Commonwealth, 23 Va. App. 306, 477 S.E.2d 1 (1996) (defendant's presence required for jury view of crime scene), and Brittingham v. Commonwealth, 10 Va. App. 530, 394 S.E.2d 336 (1990) (error to prevent court reporter from recording in camera examination by both parties of witness on whether defendant was offered immunity for cooperating).  We conclude that neither the nature nor purpose of the pretrial hearing mandated the defendant's presence.

For the foregoing reasons, we affirm the defendant's convictions.

<u>Affirmed.</u>

Benton, J., dissenting.

The standard for granting jury instructions is well established.

> If there is evidence in the record to support the defendant's theory of defense, the trial judge may not refuse to grant a proper, proffered instruction. "Furthermore, where evidence tends to sustain both the prosecution's and the defense's theory of the case, the trial judge is required to give requested instructions covering both theories." When instructing the jury, the trial judge must be mindful that:

> [t]he jury is not required to accept, in toto, either the theory of the Commonwealth or that of an accused. They have the right to reject that part of the evidence believed by them to be untrue and to accept that found by them to be true. In so doing, they have broad discretion in applying the law to the facts and in fixing the degree of guilt, if any, of a person charged with a crime.

Delacruz v. Commonwealth, 11 Va. App. 335, 338-39, 398 S.E.2d 103, 105 (1990) (citations omitted). I would hold that the trial judge erred in refusing to instruct the jury on heat of passion and affirmative defenses.

I.

"Although the Commonwealth prevailed at trial, the appropriate standard for review requires that we view the evidence with respect to the refused instruction in the light most favorable to the defendant." Boone v. Commonwealth, 14 Va. App. 130, 131, 415 S.E.2d 250, 251 (1992). So viewed, the

record contains evidence that Mark Graham went to his uncle's residential trailer to shower and wash his clothing. When Graham was preparing to shower, his uncle, who Graham said had molested him in the past, improperly touched him. After they argued, Graham's uncle telephoned Swanson Mullins and told him "to come . . . with the guns and shoot [Graham]." Graham struggled with his uncle and ran from the trailer. As Graham ran up the hollow toward a wooded hill and away from Mullins's residence, he saw Mullins and three other men approaching him. Graham testified that he knew he was in danger because all four men were armed with guns and because Mullins had previously threatened to kill him. He had seen Mullins and his friends beat other people, and he knew they were "enforcers."

As Graham ran up the hollow and passed the Hashes' trailer, he saw guns inside. Graham testified that he saw the armed men coming around the Gateses' trailer and moving up the hill toward him "before [he] ever got in [the Hashes'] trailer." He said that "[e]verything was happening so fast" and explained his conduct as follows:

> I got up to about the trailer and I don't know why I was looking over there, but I mean I was looking over in that direction and as soon as I seen two guns hanging on the gun rack I went straight through the window and got one. I don't remember if I loaded the gun or not before I went outside but the gun was obviously loaded. I must have checked and seen it was loaded. And I shot up in the air, one, two or three times. I ain't for sure. I don't remember.

> Warning them that I got a gun. You know,
> don't come after me because I'm armed too.

Graham testified that he was afraid the men intended to shoot or hurt him and that he shot in the air because he "was wanting them to back off and not keep coming . . . [toward him]." He testified that the men continued up the hill and began shooting at him. He shot at the men, telephoned 911 for help, and then called the telephone operator after he got no answer at 911. As he was asking the operator to contact the police and shooting at the men who were shooting at him, he realized that shots were also being fired from the Gateses' trailer. He then shot at the Gateses' trailer. When the operator told Graham that the police would arrive in ten or fifteen minutes, he had no more ammunition. Graham then ran from the trailer farther up the hollow into the woods.

When the police arrived, they saw a man behind the Gateses' trailer with a shotgun. That man directed the police to his friend who had been shot and who also had a shotgun. When the police learned that other armed men were around, they ordered the men to come out of the woods. Three men came from the direction of the Hashes' trailer; they all had "long guns," one of which was a shotgun.

The grand jury indicted Graham for the aggravated malicious wounding of Lewis Collins, the attempted malicious wounding of Donald Keene, use of a firearm in the commission of each of

those felonies, shooting into an occupied dwelling, possession of a firearm by a convicted felon, statutory burglary, and grand larceny.  At his jury trial, Graham was acquitted of malicious wounding, attempted malicious wounding, and use of a firearm in the commission of those shootings.  The jury convicted him of shooting into an occupied dwelling, statutory burglary, grand larceny, and possession of a firearm by a convicted felon.

II.

The trial judge refused to instruct the jury as follows concerning heat of passion:

> Heat of passion excludes malice when the heat of passion arises from provocation that reasonably produces an emotional state of mind such as hot blood, or rage, anger, resentment, terror or fear so as to cause one to act on impulse without conscious reflection.  Heat of passion must be determined from circumstances as they appeared to defendant but those circumstances must be such as would have aroused heat of passion in a reasonable person.

> If a person acts upon reflection or deliberation, or after his passion has cooled or there has been a reasonable time or opportunity for cooling, then the act is not attributable to heat of passion.

The refusal was plain error because it deprived Graham of an instruction that would have put before the jury an element of his defense.  "Malice and heat of passion are mutually exclusive; malice excludes passion, and passion presupposes the absence of malice."  <u>Barrett v. Commonwealth</u>, 231 Va. 102, 106,

341 S.E.2d 190, 192 (1986) (citations omitted).  As the majority notes, "[h]eat of passion" refers to "the _furor_ _brevis_ which renders a [person] deaf to the voice of reason."  _Hannah v. Commonwealth_, 153 Va. 863, 870, 149 S.E. 419, 421 (1929).  Therefore, heat of passion may be "determined by the nature and degree of the provocation, and may be founded upon rage, fear, or a combination of both."  _Barrett_, 231 Va. at 106, 341 S.E.2d at 192 (citations omitted).  Whether Graham acted maliciously or in the heat of passion, therefore, was a jury question.  See _id._

Graham testified that shots were being fired at him from the Gateses' trailer and that he shot at that person in self-defense.  If the jury believed Graham's testimony, it provided the basis upon which they could have concluded, if properly instructed, that Graham acted in the heat of passion when he obtained the gun from the Hashes' trailer and returned gunfire toward the person who was shooting at him from the Gateses' trailer.

It is clear from the jury's verdicts that the jury accepted Graham's claim of self-defense.  The jury acquitted him of the charges of aggravated malicious wounding, attempted malicious wounding, and the use of a firearm in the commission of those offenses.  Furthermore, the evidence proved the police found two armed men, one of whom had been shot, behind the Gateses' trailer.  The jury, however, acquitted Graham of charges concerning that wounding.  "A plea of self defense and a claim

of provoked heat of passion do not conflict with each other."

Barrett, 231 Va. at 106, 341 S.E.2d at 192.  Because the

evidence in the record could support a jury finding that Graham

acted in the heat of passion while shooting into the trailer to

defend himself, I would hold that the trial judge erred in

refusing the instruction.

III.

In view of Graham's testimony, the trial judge instructed

the jury as follows concerning Graham's affirmative defense of

duress:

> If you find from the evidence that the
> defendant acted under duress, then you must
> find him not guilty.  In order for the
> defendant to use the defense of duress, you
> must find from the evidence that he was
> threatened and that he had a reasonable fear
> of imminent death or serious bodily injury.
> The defense of duress is not available if
> the defendant had a reasonable opportunity
> to escape and did not do so or had a
> reasonable opportunity to avoid committing
> the crime without being harmed.

The trial judge, however, did not inform the jury of the

standard by which it was required to measure that evidence.  The

necessary result of this omission was to leave the jury

uninformed of a critical aspect of the law relating to Graham's

defense.  Thus, I would also hold that the trial judge erred in

refusing the following instruction that Graham tendered:

> The defendant need not prove his affirmative
> defenses beyond a reasonable doubt, or even
> by a preponderance of the evidence.  The
> defendant must only introduce evidence

which, when considered with the whole evidence, creates a reasonable doubt regarding his guilt.

In its brief, the Commonwealth acknowledges "that a defendant need only sustain a plea of self-defense to the point where the evidence in support thereof, when considered along with all other evidence produced in the case, raises a reasonable doubt in the minds of the jurors regarding the guilt of the accused."  McGhee v. Commonwealth, 219 Va. 560, 561, 248 S.E.2d 808, 809 (1978) (citation omitted).  The record does not support, however, the Commonwealth's contention that the subject of Graham's burden was adequately covered by other instructions.  Although the trial judge correctly instructed the jury that "[t]here is no burden on the defendant to produce any evidence," that instruction fails to inform the jury of the appropriate standard by which to weigh Graham's defenses in relation to the Commonwealth's ultimate burden of proof.

"The common law defense of duress excuses acts which would otherwise constitute a crime, where the defendant shows that the acts were the product of threats inducing a reasonable fear of immediate death or serious bodily injury."  Pancoast v. Commonwealth, 2 Va. App. 28, 33, 340 S.E.2d 833, 836 (1986).  Graham testified that he acted under conditions of extremis and to defend himself when he entered the Hashes' trailer to get a gun to hold his attackers at bay.

Each claim of self-defense and duress "is an affirmative defense, the absence of which is not an element of [the offenses Graham was charged with committing]." McGhee, 219 Va. at 562, 248 S.E.2d at 810.  Graham had the burden of persuading the jury that he acted in self-defense or under duress only to the degree necessary to raise a reasonable doubt about his guilt.  See id.; see also Smith v. Commonwealth, 17 Va. App. 68, 71, 435 S.E.2d 414, 416 (1993) (discussing the elements of self-defense); Pancoast, 2 Va. App. at 33, 340 S.E.2d at 836 (discussing the elements of duress).  "Whether an accused proves circumstances sufficient to create a reasonable doubt that he acted in [a manner that is excused by the affirmative defense] is a question of fact."  Smith, 17 Va. App. at 71, 435 S.E.2d at 416.  In making that factual determination, the jury should have been informed of the limited nature of Graham's burden of persuasion.

The Commonwealth argues that self-defense is similar to the concept of alibi for which the jury does not have to be separately instructed on the burden of proof.  In Fenner v. Commonwealth, 152 Va. 1014, 148 S.E. 821 (1929), however, the Supreme Court held that alibi is not an affirmative defense. See id. at 1019, 148 S.E. at 822.

> "Alibi is regarded by some courts as a
> special affirmative defense, but the better
> doctrine seems to be that it is not a
> defense in the accurate meaning of the term,
> but a mere fact shown in rebuttal of the
> State's evidence; and, consequently, the
> evidence introduced to support it should be

> left to the jury, uninfluenced by any charge
> from the court tending to place it upon a
> different footing from other evidence in the
> case or calculated to disparage and excite
> prejudice against it."
>
>    *       *       *       *       *       *       *
>
> "Thus, where the evidence offered by the
> defendant is of an alibi - that is, that he
> was at another place at the time the crime
> was committed, and therefore could not have
> committed it - he is obviously merely
> disproving the truth of the prosecution's
> evidence or inference from evidence; he is
> making an entirely negative defense.  It is
> not for him to establish an alibi, but
> simply to throw doubt on the case of the
> prosecution."

Id. at 1019-20, 148 S.E. at 822-23 (citations omitted).

The instruction Graham tendered was vital to the jury's understanding because many of the instructions to the jury addressed the notion of proof beyond a reasonable doubt, the Commonwealth's ultimate burden of persuasion.  It is reasonable to conclude that the lack of an instruction clearly explaining Graham's burden of persuasion effectively conveyed to the jury that Graham had to prove his affirmative defenses beyond a reasonable doubt.  No instruction either informed them otherwise or provided them with the proper guidance.  See Taylor v. Commonwealth, 12 Va. App. 419, 422, 404 S.E.2d 78, 80 (1991) (holding that "the trial judge should [instruct] the jury as to the law of the case applicable to the facts in such a manner that they may not be misled").  The trial judge was obligated to properly instruct the jury on this point so that the jury would

not apply the wrong standard and expect Graham to meet the same

high level of persuasion contained in other instructions it

received.

> The purpose of an instruction is to furnish
> guidance to the jury in their deliberations,
> and to aid them in arriving at a proper
> verdict, so far as it is competent for the
> court to assist them.  The chief object
> contemplated in the charge of the judge is
> to explain the law of the case, to point out
> the essentials to be proved on the one side
> or the other, and to bring into view the
> relation of the particular evidence adduced
> to the particular issues involved.  In his
> instructions the trial judge should inform
> the jury as to the law of the case
> applicable to the facts in such a manner
> that they may not be misled.

Cooper v. Commonwealth, 2 Va. App. 497, 500, 345 S.E.2d 775, 777

(1986) (citation omitted).

IV.

In summary, the trial judge committed reversible error in

refusing to give the instructions concerning heat of passion and

Graham's burden of persuasion on affirmative defenses.  In

acquitting Graham of malicious wounding, attempted malicious

wounding, and the lesser-included offenses of those charges, the

jury accepted Graham's defense that he was acting in

self-defense when he shot and wounded one of the armed men

behind the Gateses' trailer and shot at another of the armed men

pursuing him.  In determining Graham's defense that he entered

the house and took the guns to defend himself because of duress,

the jury was not informed that proof of this defense was not to

be determined by the heightened standard of beyond a reasonable doubt, which was contained in several instructions.  "As this Court noted in Cooper v. Commonwealth, 2 Va. App. 497, [500,] 345 S.E.2d 775 [, 777] (1986), '[t]he purpose of an instruction is to furnish guidance to the jury in their deliberations, and to aid them in arriving at a proper verdict.'"  Diffendal v. Commonwealth, 8 Va. App. 417, 422, 382 S.E.2d 24, 26 (1989) (citation omitted).

For these reasons, I would reverse the convictions and remand for a retrial with a properly instructed jury.  I dissent.