# Richmond
## JERMAINE JEROME SMITH
### v.
## COMMONWEALTH OF VIRGINIA
No. 0488-92-2
Decided September 14, 1993

COUNSEL

Jody Ann Jacobson, Assistant Public Defender (David J. Johnson, Public Defender, on brief), for appellant.

Kathleen B. Martin, Assistant Attorney General (Mary Sue Terry, Attorney General, on brief), for appellee.

OPINION

**COLEMAN, J.**—In a bench trial, Jermaine Jerome Smith was found guilty of voluntary manslaughter. We must decide whether the evidence proved as a matter of law that Smith acted in self-defense when he intentionally killed Donnell Skinner. The question is whether the killing was an excusable homicide.

Based on familiar principles, we review the evidence in the light most favorable to the Commonwealth and grant to it all reasonable inferences fairly deducible therefrom. The undisputed evidence proved that Smith retreated as far as possible and killed Skinner only to avoid being killed himself. Accordingly, we hold that the facts establish excusable self-defense as a matter of law. Therefore, we reverse the manslaughter conviction and dismiss the charges against Smith.

On October 31, 1991, at approximately 2:00 a.m., Smith shot Donnell Skinner in the apartment of Crystal White, Smith's girlfriend.

Donnell Skinner and James Thompson came to White's apartment to continue a discussion with Smith regarding some missing drugs. Earlier that night, Smith had been confronted by Skinner and Thompson on the street after Smith had taken several packets of cocaine that he "found" hidden near White's apartment building. When Skinner and Thompson accused Smith of stealing their cocaine and demanded its return, Smith gave them one of the packets. He kept the others, however, and went to White's apartment. Soon thereafter, Skinner and Thompson arrived, spoke briefly with Smith about their missing drugs and, after getting no satisfaction, they left. Fifteen minutes later, they returned and accused Smith and White of stealing their drugs. Both Skinner and Thompson displayed firearms during the confrontation. Unbeknownst to Skinner and Thompson, Smith was armed with a pistol in his back pocket.

Skinner grabbed White and put his gun to her face. Smith, who knew that Skinner had a reputation "for robbing and shooting people," urged White to tell Skinner anything that she knew about the missing cocaine. Skinner took White into the bathroom and informed her that he was not going to hurt her. However, when he returned to the living room, he told Smith that he was going to kill White. Attempting to placate Skinner, Smith and another friend, Lamont, who was in the apartment, gave Skinner approximately $200 for the missing drugs. Despite this attempt to forestall violence, Skinner continued to make threats, saying, "[W]hy don't we just go ahead and do what we said we were going to do. . . . [T]hey gonna tell on us. . . . [W]e gotta do what we gotta do."

Smith, who at this time had backed from the living room into the kitchen, saw Thompson cock his gun. Skinner, with his gun in hand, began to turn toward Smith. As Skinner did so, Smith drew his pistol and fired at Skinner, hitting him in the head. Thompson returned fire, and Smith continued shooting randomly until all his ammunition had been fired. He then peered into the living room, at which time Thompson, who was lying on the floor, shot Smith in the arm. Smith fled out the door to a neighbor's apartment. From there, he went by taxi to the hospital. Smith, Thompson, and Skinner had all been shot. Skinner, who was shot twice, died from a gunshot wound to the head.

At the hospital, Smith first told a detective that he had been shot in public by a stray bullet and knew no details about the shooting. Later, on November 5, 1991, Smith told the detective in a videotaped interview about the shooting in White's apartment. At trial, Smith claimed

that he killed Skinner in self-defense. The trial judge found, however, that by taking the drugs, Smith had instigated a conflict with Skinner and Thompson and, therefore, that the killing had been during mutual combat.

Self-defense is an affirmative defense which the accused must prove by introducing sufficient evidence to raise a reasonable doubt about his guilt. *McGhee v. Commonwealth,* 219 Va. 560, 562, 248 S.E.2d 808, 810 (1978). Whether an accused proves circumstances sufficient to create a reasonable doubt that he acted in self-defense is a question of fact. *Yarborough v. Commonwealth,* 217 Va. 971, 979, 234 S.E.2d 286, 292 (1977). A trial judge's factual findings will not be disturbed on appeal unless plainly wrong or without evidence to support them. *Id.*

Killing in self-defense may be either justifiable or excusable. If it is either, the accused is entitled to an acquittal. *Bailey v. Commonwealth,* 200 Va. 92, 96, 104 S.E.2d 28, 31 (1958).

"Justifiable homicide in self-defense occurs [when] a person, without any fault on his part in provoking or bringing on the difficulty, kills another under reasonable apprehension of death or great bodily harm to himself." *Id.* If an accused "is even slightly at fault" at creating the difficulty leading to the necessity to kill, "the killing is not justifiable homicide." *Perricllia v. Commonwealth,* 229 Va. 85, 94, 326 S.E.2d 679, 685 (1985); *Dodson v. Commonwealth,* 159 Va. 976, 981, 167 S.E. 260, 261 (1933). Any form of conduct by the accused from which the fact finder may reasonably infer that the accused contributed to the affray constitutes "fault." *Bell v. Commonwealth,* 2 Va. App. 48, 58, 341 S.E.2d 654, 659 (1986).

> Excusable homicide in self-defense occurs where the accused, although in some fault in the first instance in provoking or bringing on the difficulty, when attacked retreats as far as possible, announces his desire for peace, and kills his adversary from a reasonably apparent necessity to preserve his own life or [to] save himself from great bodily harm.

*Bailey,* 200 Va. at 96, 104 S.E.2d at 31 (citations omitted). Whether the danger facing the accused is "reasonably apparent" is determined from the viewpoint of the accused at the time that he shot the victim. *McGhee,* 219 Va. at 562, 248 S.E.2d at 810. However, his fear alone does not excuse the killing; there must be an overt act indicating the

victim's imminent intention to kill or seriously harm the accused. *Yarborough,* 217 Va. at 975, 234 S.E.2d at 290.

Arguably, Smith may have provoked the initial confrontation with Skinner and Thompson by taking their cocaine. However, he attempted to withdraw from the conflict several times, and he shot Skinner and Thompson only when it became necessary to do so in order to save his life or prevent serious bodily injury to him. The danger confronting Smith was real and immediate, and he had no other course available to him. He literally was looking down the barrel of a loaded gun with another assailant standing nearby armed with a cocked pistol. It is difficult to conceive a situation more life threatening than that confronting Smith with all avenues of safety cut off. Smith was entitled to an acquittal, as a matter of law, on a finding of excusable homicide in self-defense.

Under those circumstances, the only reasonable belief that Smith could have had was that Skinner and Thompson intended to carry out their threats to kill him and that he was in imminent danger of death or serious bodily injury. Both Skinner and Thompson arrived at White's apartment making death threats and brandishing firearms. They blocked the front door, making it apparent that no one would be able to leave. Skinner took White into another room and threatened to kill her. Smith knew of Skinner's reputation for violence and attempted to forestall any violence by offering him money. Despite Smith's gesture to end the conflict, Skinner continued to make threats.

■ Smith retreated as far as possible before shooting. He went into the kitchen area and did not shoot until he saw Thompson cock his gun and Skinner turn toward him with his gun after threatening to "do what they had to." Although the kitchen had a back door, it offered him no avenue to escape. Skinner and Thompson were within easy striking distance with their guns poised. The law does not require a person to suffer the last lethal blow before being able to take up his weapon to defend his life. *See Nelson v. Commonwealth,* 168 Va. 742, 747, 191 S.E. 620, 624 (1937); *Hensley v. Commonwealth,* 161 Va. 1033, 1035, 170 S.E. 568, 568 (1933).

■ No credible evidence supports the trial judge's finding that Smith shot Skinner while they were engaged in mutual combat. In order for combat to have been "mutual it must have been voluntarily and mutually entered into." *Harper v. Commonwealth,* 165 Va. 816, 820, 183 S.E. 171, 173 (1936). "One who is assaulted may and usual-

ly does defend himself, but the ensuing struggle cannot be accurately described as a mutual combat." *Id.* Otherwise, "every fight would be a mutual combat." *Id.* Smith did not voluntarily enter into the shootout with Skinner and Thompson. Although Smith arguably brought about the difficulty that eventually led to the shootout, he attempted several times to prevent the violence that ultimately ensued. Having no other reasonable avenue of escape, Smith took the only action available to prevent his death or serious bodily injury.

For these reasons, we reverse the conviction of voluntary manslaughter.

*Reversed.*

Willis, J., and Elder, J., concurred.