COURT OF APPEALS OF VIRGINIA

Present:   Judges Fulton, Lorish and White
Argued at Norfolk, Virginia


ROBERT DAMON STONEWALL
                                                    MEMORANDUM OPINION[*] BY
v.          Record No. 1282-23-1          JUDGE KIMBERLEY SLAYTON WHITE
                                                      SEPTEMBER 17, 2024
COMMONWEALTH OF VIRGINIA


FROM THE CIRCUIT COURT OF THE CITY OF NEWPORT NEWS
Bryant L. Sugg, Judge

Charles E. Haden for appellant.

Matthew J. Beyrau, Assistant Attorney General (Jason S. Miyares,
Attorney General, on brief), for appellee.


The trial court convicted Robert Damon Stonewall of first-degree murder, in violation of

Code § 18.2-32; aggravated malicious wounding, in violation of Code § 18.2-51.2; and two

counts of use of a firearm in the commission of a felony, in violation of Code § 18.2-53.1.  The

court sentenced Stonewall to a total of life imprisonment plus 58 years' incarceration, with all

but 72 years suspended.  On appeal, Stonewall challenges the sufficiency of the evidence to

support his convictions.

First, he argues that his aggravated malicious wounding and the accompanying use of a

firearm convictions must be reversed because the evidence failed to prove the victim's injuries

"caused permanent and significant physical impairment."  He asserts that because only the

victim's mother, not the victim herself, testified about the injuries, and that testimony

demonstrated only that the victim had "a scar about the size of a quarter," the evidence was

---

[*] This opinion is not designated for publication.  See Code § 17.1-413(A).

insufficient.  Next, citing his own testimony, Stonewall argues that all of his convictions must be reversed because the evidence failed to exclude the hypothesis that he had acted in self-defense.

BACKGROUND[1]

On the evening in question, July 12, 2021, Stonewall shot Brian Moore and Katelyn Adams outside of Sea View Lofts, the apartment complex where Adams lived.  After an incident where Moore had "pistol whipped" Stonewall, Stonewall obtained a gun and confronted Moore and Adams outside the apartment complex.  The group exchanged words and Stonewall shot at Moore and Adams ten times, killing Moore and grievously wounding Adams.

Events leading up to the shootings involved romantic relationships, infidelities, and retaliations.  Stonewall and Moore were both in a romantic relationship with the same woman, N'Dea Roberts, who was the mother of two of Moore's children.  At the same time, Moore was in a relationship with Adams, who was Stonewall's cousin.  Roberts said that she had a tumultuous relationship with Moore: "We fought a lot about his infidelities."  Roberts testified that she hung out with Stonewall at a party three days before the shootings, culminating with her spending the night and having sexual relations with Stonewall at an apartment.  The next day, after hearing about Roberts and Stonewall's night together, Moore drove to confront Roberts.  Roberts testified that Moore pushed her and cursed at her before getting back in his car and driving away.

On that same day, Adams was visiting with Stonewall and his cousin at his cousin's apartment.  When she left, Moore, armed with multiple handguns, immediately entered the

---

[1] We recite the facts "in the 'light most favorable' to the Commonwealth, the prevailing party in the trial court."  *Hammer v. Commonwealth*, 74 Va. App. 225, 231 (2022) (quoting *Commonwealth v. Cady*, 300 Va. 325, 329 (2021)).  Doing so requires us to "discard the evidence of the accused in conflict with that of the Commonwealth, and regard as true all the credible evidence favorable to the Commonwealth and all fair inferences to be drawn therefrom."  *Cady*, 300 Va. at 329 (quoting *Commonwealth v. Perkins*, 295 Va. 323, 324 (2018)).

apartment and confronted Stonewall there.  He pistol-whipped Stonewall and held his cousin at gun point.  As a result of this incident, Stonewall suffered a large gash in his mouth, a chipped tooth, and several cuts on his face.  Afterwards, neither Stonewall nor his cousin called the police.  His cousin told Stonewall that Adams had left the door unlocked so that Moore could get inside.  Following the pistol-whipping, Stonewall started carrying a handgun that a friend gave him.

Later that evening, Roberts received numerous text messages from Stonewall, angry that Roberts had told Moore about their night together believing that it led to the pistol-whipping.  The pair exchanged nearly 600 texts over the next two days about the incident.  Stonewall texted Roberts, "Where he stay?"  Stonewall then repeated his question to Roberts two more times, in an attempt to figure out where Moore lived and repeatedly asked Roberts what Moore looked like.  Later, Stonewall texted Roberts again and stated, "Ok I'm just all over the place . . . so if anything happen don't act surprised."  Additionally, Stonewall texted Roberts that he was "trynna calm down but I can't."

On the day of the shootings, Roberts was in Sea View Lofts where Adams lived and ran into Stonewall.  After a short confrontation and at Roberts' request, Stonewall left.  She then received a text message from Stonewall.  Referring to Moore, Stonewall texted "Tell him to come outside."  Roberts then called Moore on the phone, leading him to exit Adams' apartment.  In the hallway outside of the apartment, Moore began beating Roberts.  During this scuffle, Moore took Roberts' gun, but Roberts was able to maintain control of the magazine itself.  After this altercation, Roberts went outside to her car to smoke and then heard gunshots.

At 10:25 p.m. Moore left the apartment complex with Adams.  Stonewall confronted them.  Stonewall exchanged words with Moore.  Suddenly, Stonewall drew the handgun from

the pocket of his hoodie and shot at Moore and Adams. Stonewall fired ten shots. Then Stonewell ran. Moore fired a gun at the fleeing Stonewall.

Officers Holden and Faulkner of the Newport News police were dispatched to the scene. When the officers arrived, they found a large crowd of people surrounding a body lying in a pool of blood. Officer Holden got to the body of the male on the ground, located the bullet wound, but found no breathing from the victim. Officer Faulkner saw the female victim and attended to her. Officer Faulkner saw a bullet wound to Adams' face with an exit wound in her neck closer to her brain stem. While Adams was unconscious, Officer Faulkner attempted to slow the bleeding. When she regained consciousness, Officer Faulkner asked her who shot her,[2] to which she replied, "He shot me . . . I can't believe he – excuse my language – he fucking shot me." Adams was struck by two of the bullets fired by Stonewall. One bullet hit her face, passed through it, and exited the back of her neck, near her brain stem. The other struck her in the leg.

The autopsy revealed Moore died from "massive internal bleeding" from the multiple gunshot wounds. Additionally, the medical examiner, Dr. Nicole Masian, confirmed that Moore had died from two gunshot wounds to the torso, one in the shoulder and one in the back. However, Adams was treated at the hospital and survived the encounter. At trial, Adams' mother testified that the gunshot wound left a scar the size of a quarter and that Adams still experienced "debilitating pain" in her jaw over a year and a half after the shooting.

At the scene of the crime, two firearms were recovered. Crime scene technicians found a black Glock 17 nine-millimeter handgun in the grass near Moore's body, and a Glock 19 nine-millimeter handgun, without a gun magazine, in a purse belonging to Adams.

---

[2] Officer Faulkner testified that he believed Adams was going to die when he asked the question.

- 4 -

The shooting was recorded by the complex's surveillance video, and the video recording was introduced into evidence. The property manager, Alana Maldonado, testified that residents were calling the emergency line telling her that a shooting had occurred. She stated that this caused her to log in to review the camera footage where she testified that she "saw a lady and a guy get shot." Detective Ruhlen was assigned to investigate Moore's death and testified that he obtained this surveillance video from the apartment complex. The videos show a compilation of both Stonewall and Moore's activities the evening of July 12, 2021. These videos, collected by Detective Ruhlen and shown to the jury, clearly show Stonewall shooting both Moore and Adams. The video shows that Stonewall was waiting outside the apartment and in front of Moore's car, a silver Nissan Altima.

Stonewall was arrested nine days later, on July 21, 2021. Afterwards, Detective Ruhlen provided him *Miranda*[3] warnings, which were waived by Stonewall, and conducted an interview. When asked to provide his side of the story, Stonewall replied, "I have no side of no story." Stonewall stated that he did not know N'Dea Roberts or Katelyn Adams. Stonewall also stated that he was not at the SeaView Lofts apartment complex on July 12, 2021.

At trial, however, Stonewall admitted that he shot the victims but claimed he acted in self-defense after the pair of victims threatened to harm him. He asserted that Moore had a gun in his hand and yelled, "You didn't learn your fucking lesson." Stonewall claimed that he put his "hand up" to "defuse the situation," but Moore continued to act aggressively, so Stonewall shot "because [he] was scared" and "thought [Moore] was going to shoot [him]." Stonewall asserted that he shot Adams by accident and was only attempting to shoot Moore.

At the conclusion of all the evidence, Stonewall moved to strike and argued: (1) the evidence was insufficient to prove any of the offenses because he acted in self-defense; (2) the

---

[3] *Miranda v. Arizona*, 384 U.S. 436 (1966).

evidence was insufficient to prove the charge of aggravated malicious wounding because the Commonwealth failed to prove a permanent and significant injury; and (3) the evidence was insufficient to prove the charge of use of a firearm in the commission of aggravated malicious wounding because the Commonwealth failed to prove aggravated malicious wounding. The trial court denied the motion to strike.

The jury found Stonewall guilty of all offenses. The trial court sentenced Stonewall to life in prison plus 58 years, with all but 72 years suspended. This appeal followed.

ANALYSIS

"On review of the sufficiency of the evidence, 'the judgment of the trial court is presumed correct and will not be disturbed unless it is plainly wrong or without evidence to support it.'" *Ingram v. Commonwealth*, 74 Va. App. 59, 76 (2021) (quoting *Smith v. Commonwealth*, 296 Va. 450, 460 (2018)). "The question on appeal, is whether 'any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Id.* (quoting *Yoder v. Commonwealth*, 298 Va. 180, 182 (2019)). "If there is evidentiary support for the conviction, 'the reviewing court is not permitted to substitute its own judgment, even if its opinion might differ from the conclusions reached by the finder of fact at the trial.'" *Chavez v. Commonwealth*, 69 Va. App. 149, 161 (2018) (quoting *Banks v. Commonwealth*, 67 Va. App. 273, 288 (2017)).

I. Self-Defense

Stonewall argues that the trial court should have granted his motion to strike because the Commonwealth's evidence did not exclude the hypothesis that Stonewall acted in self-defense and that he reasonably feared that he was about to suffer death or bodily harm at the hands of Moore. Regardless of any retaliation contemplated by Stonewall against Moore, Stonewall

argues he should not have been deprived of his right of self-defense in a "moment of unexpected peril."

Self-defense "is an affirmative defense." *McGhee v. Commonwealth*, 219 Va. 560, 562 (1978). As such, the burden of production lies with the defendant "to produce some evidence to support a claim of self-defense." *Taylor v. Commonwealth*, 77 Va. App. 149, 168 (2023). Once the defendant satisfies this burden, "the Commonwealth must then shoulder its burden of persuasion[, which] require[es] proof sufficient under the reasonable-doubt standard to permit a rational factfinder to reject the defense and to find the defendant guilty." *Id.* (quoting *Myers v. Commonwealth*, 299 Va. 671, 679 (2021)).

To sustain a conviction, the Commonwealth is not required to disprove self-defense beyond a reasonable doubt, but it must prove every element of the offense beyond a reasonable doubt. *See McGhee*, 219 Va. at 562 (The "absence of [self-defense] is not an element of murder."). An accused who claims self-defense implicitly admits that the use of deadly force was intentional. *Id.* In other words, a defendant pleading self-defense "assumes the burden of introducing evidence of justification or excuse that raises a reasonable doubt in the minds of the jurors." *Id.* "Whether an accused proves circumstances sufficient to create a reasonable doubt that he acted in self-defense is a question of fact." *Smith v. Commonwealth*, 17 Va. App. 68, 71 (1993).

Self-defense comes in two forms: justifiable and excusable.[4] *Bell v. Commonwealth*, 66 Va. App. 479, 487 (2016). "If it is either, the accused is entitled to an acquittal." *Smith*, 17 Va. App. at 71. "Justifiable homicide in self-defense occurs where a person, without any fault on

---

[4] Stonewall did not specify in his motion to strike whether he was claiming justifiable or excusable self-defense. The jury was only instructed on justifiable self-defense, with excusable self-defense not requested by Stonewall. Because the jury was not instructed on the theory of excusable self-defense, and it was not raised by Stonewall in the lower court, it is waived.

his part in provoking or bringing on the difficulty, kills another under reasonable apprehension of death or great bodily harm to himself." *Bailey v. Commonwealth*, 200 Va. 92, 96 (1958). It requires a two-step analysis. First, we look to the fault element; second, we look to the reasonable apprehension element.

When the accused is free from fault in bringing on the fray, the accused "need not retreat, but is permitted to stand his ground and repel the attack by force, including deadly force, if it is necessary." *Foote v. Commonwealth*, 11 Va. App. 61, 67 (1990); *McCoy v. Commonwealth*, 125 Va. 771, 775 (1919). However, a criminal defendant may not claim justifiable self-defense if he "is even slightly at fault [for] creating the difficulty leading to the necessity to kill[.]" *Smith*, 17 Va. App. at 71 (internal quotation marks and citation omitted). "Any form of conduct by the accused from which the fact finder may reasonably infer that the accused contributed to the affray constitutes 'fault.'" *Id.*

Reviewing the first step in the analysis, the evidence here shows that because of the June 10 "pistol-whipping," Stonewall had a bruised ego and was upset with Moore and Adams. Stonewall texted Roberts many times in an attempt to learn where Moore lived and asked Roberts for a picture of Moore. Stonewall also texted, "Ok I'm just all over the place . . . so if anything happen don't act surprised." Additionally, Stonewall texted Roberts that he was "trynna calm down but I can't." Stonewall sent these messages because he was angry and wanted to fight Moore. Additionally, the surveillance video showed Stonewall waiting outside the apartment complex, with a loaded gun, specifically positioned between the exit and Moore's car. Stonewall also sent Roberts a text which stated, "Tell him to come outside," a means to get Moore to a place where Stonewall could confront him. This evidence shows that a reasonable jury could find that Stonewall was at the very least "slightly at fault" for creating the incident.

The second step of the self-defense analysis reviews evidence showing a reasonable apprehension of death or great bodily harm. *Bailey*, 200 Va. at 96. Stonewall claims that the pair, Moore and Adams, threatened him and that Moore was carrying a gun. However, the surveillance video shows that when they exited the building to find Stonewall waiting for them, neither of the two were holding a gun. Moore was holding a pack of cigarettes, and Adams was holding a purse and her cell phone. Next, the surveillance video shows that when Stonewall drew his gun, Moore still did not have a gun in his hand. The video then shows that Stonewall fired ten shots at Moore and Adams, striking both twice. Stonewall then ran away, and as he did so, only then did Moore roll over and return fire. From the evidence shown, neither Adams or Moore acted in an overly threatening way towards Stonewall and were instead slowly walking towards their car. Neither brandished a weapon at Stonewall nor threatened him, making it unreasonable for Stonewall to be in apprehension of death or great bodily harm.

Although Stonewall claims he encountered Moore and Adams unexpectedly and was only acting to defend himself, the evidence shows that he was waiting for the pair by the exit of the building and that he was the initial and only aggressor in the fatal shooting. The evidence established that Stonewall was the aggressor, that the shooting was willful, deliberate, and premeditated, and that Stonewall acted with malice when he murdered Moore and gravely injured Adams.

Self-defense is a factual question that the jury here was properly allowed to consider and weigh. A reasonable juror could have rejected Stonewall's claim of justifiable self-defense because (1) he was at fault for provoking or bringing on the difficulty; and (2) he did not have a reasonable apprehension of death or great bodily harm to himself at the time that he shot Moore and Adams. Because there was enough evidence from which the jurors could reject Stonewall's claim of self-defense, the trial court did not err when it denied Stonewall's motion to strike.

## II.  Aggravated Malicious Wounding

Stonewall next argues that the Commonwealth's evidence failed to show that Adams sustained injuries that were permanent and caused significant physical impairment.  Without evidence of these specific types of injuries, Stonewall argues there is insufficient evidence for a conviction of aggravated malicious wounding.

However, Stonewall's argument really is about the type of evidence the Commonwealth put forward as proof of the element.  Testifying about the injuries to Adams were a law enforcement officer and Adams' mother.  Stonewall asserts that the Commonwealth should have been required to provide medical testimony or victim testimony.  This court long has held that expert testimony is not required to establish the significance and permanence of the victim's injuries.  *Martinez v. Commonwealth*, 42 Va. App. 9, 24-25 (2003).  Furthermore, neither this court nor our Supreme Court has held that a victim must testify to establish the element.

Our analysis, therefore, focuses on what testimony was presented and whether it provided evidentiary support for the conviction.  To sustain a conviction under the code section, the Commonwealth must prove that the victim suffered a "permanent and significant physical impairment" as a result of the defendant's actions.  Code § 18.2-51.2.

Code § 18.2-51.2(A) states:

> If any person maliciously shoots, stabs, cuts or wounds any other person, or by any means causes bodily injury, with the intent to maim, disfigure, disable or kill, he shall be guilty of a Class 2 felony if the victim is thereby severely injured and is caused to suffer permanent and significant physical impairment.

A "physical impairment" is "any physical condition, anatomic loss, or cosmetic disfigurement."  *Newton v. Commonwealth*, 21 Va. App. 86, 90 (1995).  "To prove an injury is permanent, the Commonwealth need not present definitive testimony that a victim's injuries will never improve, but instead can leave it to the common sense of the [factfinder] to determine if

the injuries are permanent." *Lamm v. Commonwealth*, 55 Va. App. 637, 644-45 (2010). Facial scars still visible several months after an attack have been found to be a "permanent and significant physical impairment" for purposes of Code § 18.2-51.2. *See Newton*, 21 Va. App. at 90 (facial scar and scar on ear were permanent and significant physical impairments).

When looking at the evidence, it is established by law enforcement testimony that Adams was struck by two bullets, one of which hit her face, passed through it, and exited the back of her neck, near her brain stem. Approximately two weeks before Stonewall's trial—which occurred almost a year and a half after the shooting—according to her mother, Adams still suffered from "debilitating pain" in her jaw and ear. In addition, Adams had a scar on her face, which was approximately the size of a quarter, where the bullet entered.[5]

Here, there is unimpeached testimonial evidence of Adams having been shot, having both an entrance wound and an exit wound, being in continuing pain, for more than a year after being wounded, and having a large facial scar. Based on the language of Code § 18.2-51.2(A) there was sufficient factual basis for the jury to conclude that Adams suffered injuries that were permanent and significant. Consequently, the trial court did not err when it denied Stonewall's motion to strike.

Stonewall hinged his allegations of error regarding the use of a firearm convictions on his argument that there was not sufficient evidence for the aggravated malicious wounding conviction and the murder conviction. Because we find that the evidence was sufficient for a jury to conclude that Stonewall was guilty of both aggravated malicious wounding and murder, we do not address his use of a firearm convictions.

---

[5] Adams' mother made these statements while under oath in the trial court. There was no hearsay objection, or objection of any sort, made to these statements, so any hearsay challenge was waived.

## CONCLUSION

For the foregoing reasons, the circuit court's judgment is affirmed.

*Affirmed.*