COURT OF APPEALS OF VIRGINIA

UNPUBLISHED

Present: Judges AtLee, Friedman and Frucci

WILLIAM JERMAINE MURPHY

MEMORANDUM OPINION[*]

v.      Record No. 2156-23-1                          PER CURIAM
                                                      JANUARY 21, 2025

COMMONWEALTH OF VIRGINIA


FROM THE CIRCUIT COURT OF SOUTHAMPTON COUNTY
Robert H. Sandwich, Jr., Judge

(Sean P. Domer; Bush & Taylor, P.C., on brief), for appellant.
Appellant submitting on brief.

(Jason S. Miyares, Attorney General; Israel-David J.J. Healy,
Assistant Attorney General, on brief), for appellee.


Following a bench trial, the circuit court convicted William Jermaine Murphy of

misdemeanor assault and battery of a family member, threatening to burn or bomb, and

possession of a firearm by a violent convicted felon, in violation of Code §§ 18.2-57.2, -83,

and -308.2 and sentenced Murphy to 10 years and 12 months of incarceration, with 5 years

suspended. On appeal, Murphy argues that the evidence was insufficient to support his

convictions. After examining the briefs and record in this case, the panel unanimously holds that

oral argument is unnecessary because "the appeal is wholly without merit." Code

§ 17.1-403(ii)(a); Rule 5A:27(a).

                                    BACKGROUND

We recite the facts "in the 'light most favorable' to the Commonwealth, the prevailing

party in the trial court." *Hammer v. Commonwealth*, 74 Va. App. 225, 231 (2022) (quoting

---

[*] This opinion is not designated for publication. *See* Code § 17.1-413(A).

*Commonwealth v. Cady*, 300 Va. 325, 329 (2021)).  Doing so requires that we "discard the evidence of the accused in conflict with that of the Commonwealth, and regard as true all the credible evidence favorable to the Commonwealth and all fair inferences to be drawn therefrom." *Cady*, 300 Va. at 329 (quoting *Commonwealth v. Perkins*, 295 Va. 323, 324 (2018)).

In June 2022, Murphy was living on and off with T.S.[1] and her two children at T.S.'s townhome.  On June 28, 2022, officers responded to a report of an armed person at 664 Cameron Street in Franklin, Virginia.  Upon arrival, officers spoke with T.S. and learned that Murphy was a felon,[2] that he was armed, and that he had threatened to burn down T.S.'s townhome.  T.S. also informed officers that Murphy had two backpacks—one black and one blue.  She stated that the backpacks contained various items including two firearms and ammunition and that one of the firearms was large and could be loaded by pulling the slide back and the other was a smaller firearm.  Based on T.S.'s complaints, officers secured a warrant for Murphy's arrest.

With T.S.'s permission, officers entered T.S.'s residence, announced their presence, and called Murphy's name but received no answer.  Once inside the home, officers observed a black backpack on the sofa and checked the contents for weapons.  There were no weapons in the backpack, but it did contain an employee name tag from Food Lion with the name Will, 13 nine-millimeter cartridges, the last will and testament of William H. Murphy, a Virginia driver's license with the name William Jermaine Murphy, and a certificate from Little Creek Pawn with Murphy's name at the top of it.  The officers then removed the backpack from the residence and placed it on the front step.  Although officers found no one in the residence's lower level, they heard someone moving furniture upstairs.  Because of safety concerns, the officers exited and established a secure perimeter around the residence.

---

[1] We use initials, rather than names, to protect the privacy of the victim.

[2] The Commonwealth entered Murphy's prior felony conviction into the record.

A few hours later, a Virginia State Police tactical team reentered and cleared T.S.'s home. In the primary bedroom, officers discovered the mattress had been flipped over and was concealing a 30-inch-by-30-inch hole that led to the vacant townhome next door. Consequently, officers secured and then executed a search warrant for 666 Cameron Street.

Troopers cleared 666 Cameron Street and discovered that the attic access in that unit had been disturbed. In the attic, the plywood sheet that demarcated the shared attic space between 666 Cameron Street and 668 Cameron Street had been destroyed. With the permission of the 668 Cameron Street renters, officers entered 668 Cameron Street and discovered Murphy was in the attic. Eventually, officers were able to extract Murphy from the attic with tear gas. The standoff between Murphy and police officers lasted 13 to 14 hours.

After Murphy was taken into custody, officers searched the attic space in 668 Cameron Street. They observed a significant amount of disturbed insulation and recovered a blue backpack and a black sweatshirt. There were no other personal effects in the attic. Within the blue backpack officers found a nine-millimeter Taurus, a .380 caliber Hi Point pistol, and .380 caliber ammunition. Both firearms were loaded and had a chambered round. Testing of the DNA mixture profile developed on the Taurus revealed that Murphy could not be eliminated as a contributor. However, the DNA mixture profile developed on the Hi Point was unsuitable for DNA comparison.

T.S. testified that on June 26, 2022, she and Murphy were eating dinner when Murphy suddenly slapped her in the face, laughed, and then slapped T.S. again. T.S. told Murphy, "Don't slap me no more," and Murphy became angry.

On June 27, 2022, T.S. asked Murphy to accompany her to the grocery store. Initially, Murphy did not want to go and instead wanted T.S. to drive him home. Eventually, Murphy acquiesced to T.S.'s request. At first, Murphy remained in the car but ultimately, he joined T.S.

and her twelve-year-old son in the store. While checking out, T.S. asked Murphy to bag the groceries and put them in the cart, but he refused. T.S. countered, "Well don't eat nothing in my house if you can't put the groceries in the basket and you can't push the basket for me." As other patrons at the store noticed T.S. and Murphy arguing, Murphy responded to T.S., "What, you trying to play me." T.S. denied trying to "play" Murphy and continued to check out.

Because it was raining, T.S. asked Murphy to retrieve the car and pull it in front of the store so that they could more easily load the groceries. Murphy refused so T.S. retrieved the car. While T.S.'s son loaded the groceries, Murphy sat in the car, "had an attitude, [and] wanted to fuss." At first, T.S. did not respond to Murphy's complaints because she did not want to argue with Murphy in front of her son. Murphy, however, "kept telling [T.S.] you don't want to be with me no more." T.S. responded, "No, I don't want to be with you no more. I don't want to be in this relationship." Murphy replied, "If you happen to leave me I will kill you . . . and you better try to find your grave site, pick out a grave site."

After arriving back at T.S.'s townhome, T.S. and Murphy's argument continued. At some point during the argument, T.S.'s mother called her. T.S. ignored the call because she did not want to "make the situation worse" but responded to her mother via text message. Murphy asked T.S. who she was texting, and T.S. replied, "That's [my] mama texting me and my daughter. I told her I was going to come get the baby when the rain slacked up." Murphy said, "Naw, go head on. When you come back your house going to be burned down." Murphy continued, "I'll burn your house down. Don't play with me, I'll burn your house down." T.S. ignored Murphy and went and sat next to her son on the living room sofa. Murphy followed and sat on the other living room sofa. T.S. noted that at this point she was nervous and did not know what to do. Murphy told T.S., "You don't know me, you really don't know who I am."

T.S. asked what Murphy was talking about. T.S.'s son then looked at T.S. and asked if she was okay. In response, Murphy stated, "That's the problem right there. That's why your son so grown because he always got to get in grown folks conversation." T.S.'s son replied, "You're not going to be talking about my mother like that." Suddenly Murphy jumped up, advanced towards T.S.'s son, and appeared ready to fight. Simultaneously, T.S. blocked Murphy's advance and directed her son to escape out of the back door. T.S. admitted that when she was blocking Murphy, she put her hand on his chest. Murphy pushed her hand away and instructed her to "[m]ove, get out my way."

T.S. remained in her home until Murphy calmed down enough for her to retrieve her daughter. T.S. explained that she stayed and calmed Murphy down because she did not want him to burn her home down while she was at her mother's home. That evening, T.S. did not sleep and kept walking around her home to ensure that Murphy remained asleep.

The next morning, T.S. and her children snuck out of the house, T.S. dropped her son off with her mom, dropped off her daughter at summer school, and T.S. went to work. Because of everything that was going on, T.S. "was crying" and had difficulty concentrating at work. Throughout the day Murphy incessantly called and texted T.S. When T.S. returned Murphy's calls after work, Murphy demanded to know where she was and when she would be home. Eventually, T.S. reported the incidents to police.

At trial, T.S. identified the recovered blue and black backpacks as the ones she had seen Murphy possess in her home. T.S. explained that several days before the incidents, she had seen two small black firearms in Murphy's blue backpack while she was washing his clothes. On cross-examination, T.S. admitted that she told an officer that Murphy had not touched her "up to this point" on June 27, 2022. T.S. later clarified that she thought the officer was referencing whether Murphy had touched her prior to the slap that occurred on June 26, 2022. T.S. reiterated

that Murphy slapped her twice on June 26, 2022, and that on June 27, 2022, she placed her hand on Murphy's chest to prevent Murphy from chasing her son, which resulted in Murphy knocking T.S.'s hand away.

Murphy testified in his own defense.[3]  Murphy attested that in the evening on June 28, 2022, his parole officer informed him that he had warrants for his arrest and that he needed to turn himself in.  Murphy decided to wait for T.S. to return home from work so that she could drive him to his parole officer in Norfolk.  While waiting, Murphy fell asleep and was awoken by loud booms.  An officer called his phone and told him to come out with his hands up.  Scared and fearing he would be shot by police, Murphy hid in the attic.  Murphy denied making a hole in T.S.'s bedroom wall or having anything with him when he entered the attic space.  He denied knowledge of the blue backpack, or the firearms found within, and claimed to have never seen that bag before.  Murphy also denied threatening to burn T.S.'s home, hitting T.S., or being aggressive toward T.S.'s son.  Murphy claimed that on June 27, 2022, T.S. had grabbed him and he "yanked away from her but [he] never put [his] hand on her."  Murphy also claimed that T.S. threatened to lock him up if he talked to another woman.

At the close of all the arguments from counsel, the circuit court made certain factual findings before announcing its verdict.  The circuit court found that: T.S. was "very credible" and that Murphy was incredible; Murphy had struck T.S. and pushed T.S.'s arm against her will; Murphy threatened to burn T.S.'s house down; and, because of Murphy's threat, T.S. was frightened and did not return home because she feared Murphy would carry out his threat.

Concerning the firearm charge, T.S. testified that Murphy had two backpacks, a blue backpack and a black backpack, and that she had observed two firearms in the blue backpack several days before this incident.  When officers entered T.S.'s home, they found a black

---

[3] Murphy admitted that he was a felon.

backpack that contained Murphy's belongings and nine-millimeter cartridges. After extracting Murphy from a neighbor's attic, officers recovered a blue backpack. The record established that there were no personal items in the attic except for the recovered blue backpack and the black sweatshirt. The blue backpack contained two firearms, one of which was capable of firing nine-millimeter cartridges. The circuit court inferred that the cartridges found in the black backpack could be fired from the nine-millimeter firearm found in the blue backpack. Finally, Murphy could not be excluded as a contributor of the DNA found on one of the firearms. The circuit court convicted Murphy of the charges and sentenced him to 10 years and 12 months of incarceration, with 5 years suspended. Murphy appeals.

ANALYSIS

Murphy argues that the evidence was insufficient to support his convictions. "On review of the sufficiency of the evidence, 'the judgment of the trial court is presumed correct and will not be disturbed unless it is plainly wrong or without evidence to support it.'" *Ingram v. Commonwealth*, 74 Va. App. 59, 76 (2021) (quoting *Smith v. Commonwealth*, 296 Va. 450, 460 (2018)). "The question on appeal, is whether 'any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Id.* (quoting *Yoder v. Commonwealth*, 298 Va. 180, 182 (2019)). "If there is evidentiary support for the conviction, 'the reviewing court is not permitted to substitute its own judgment, even if its opinion might differ from the conclusions reached by the finder of fact at the trial.'" *Chavez v. Commonwealth*, 69 Va. App. 149, 161 (2018) (quoting *Banks v. Commonwealth*, 67 Va. App. 273, 288 (2017)).

*I. Assault and Battery of a Family Member*

Murphy argues that T.S. was incredible because she did not initially report to police that he had slapped her. He further contends that his alleged slapping of T.S. occurred before the dates set out in the warrant and could not be the basis for his assault and battery of a family

member conviction. Murphy asserts that T.S. unwantedly touched him on June 27, 2022, and that he pushed T.S.'s hand away in self-defense.

Code § 18.2-57.2(A) provides that "[a]ny person who commits an assault and battery against a family or household member is guilty of a Class 1 misdemeanor." "Assault and battery are common law crimes." *Montague v. Commonwealth*, 278 Va. 532, 541 (2009). "[B]ecause the elements of assault are not statutorily defined, [courts] must apply the common law definition." *Clark v. Commonwealth*, 279 Va. 636, 641 (2010). To sustain a conviction for an assault, the Commonwealth must prove

> an assailant engage[d] in an overt act intended to inflict bodily harm and ha[d] the present ability to inflict such harm *or* [the assailant] engage[d] in an overt act intended to place the victim in fear or apprehension of bodily harm and create[d] such reasonable fear or apprehension in the victim.

*Id.* (quoting *Carter v. Commonwealth*, 269 Va. 44, 46 (2005)).

"To sustain a conviction for battery, the Commonwealth must prove a 'wil[l]ful or unlawful touching' of another." *Parish v. Commonwealth*, 56 Va. App. 324, 330 (2010) (alteration in original) (quoting *Wood v. Commonwealth*, 149 Va. 401, 404 (1927)). A willful act is one that is "[v]oluntary and intentional, but not necessarily malicious." *Willful, Black's Law Dictionary* (11th ed. 2019). "The law is clear that '[t]he slightest touching of another . . . if done in a rude, insolent, or angry manner, constitutes a battery for which the law affords redress.'" *Kelley v. Commonwealth*, 69 Va. App. 617, 628 (2019) (alterations in original) (quoting *Adams v. Commonwealth*, 33 Va. App. 463, 469 (2000)). "An intentional touching qualifies as a battery unless the actor has some legal justification or excuse. The presence of a justification or excuse transforms what would otherwise be a criminal offense into a permissible act. Common justifications for battery include consent and self-defense." *Woodson v. Commonwealth*, 74 Va. App. 685, 694 (2022).

"Self-defense excuses or justifies a homicide or assault committed while repelling violence arrayed against the defendant. It is a response to the threat of death or serious bodily harm. It is a defense to an act of violence that repels violence directed at the defendant." *Graham v. Commonwealth*, 31 Va. App. 662, 672 (2000). "Self-defense is an affirmative defense which the accused must prove by introducing sufficient evidence to raise a reasonable doubt about his guilt. Whether an accused proves circumstances sufficient to create a reasonable doubt that he acted in self-defense is a question of fact." *Hughes v. Commonwealth*, 39 Va. App. 448, 464 (2002) (quoting *Smith v. Commonwealth*, 17 Va. App. 68, 71 (1993)).

The circuit court, sitting as the fact finder, "ha[d] the opportunity to see and hear the witnesses, ha[d] the *sole* responsibility to determine their credibility, the weight to be given their testimony, and the inferences to be drawn from proven facts." *Commonwealth v. McNeal*, 282 Va. 16, 22 (2011) (quoting *Commonwealth v. Taylor*, 256 Va. 514, 518 (1998)). Thus, it was the circuit court's prerogative to decide how much credibility to give the testimony. Here, the circuit court specifically found T.S. to be credible and Murphy to be incredible. Accordingly, the fact that Murphy sought to impeach T.S.'s testimony provides no cause for this Court to disturb the circuit court's credibility determinations.

This Court will uphold a "verdict . . . if the evidence is sufficient to prove beyond a reasonable doubt that a crime occurred and that the defendant committed the crime, even though the evidence is such that there may be a reasonable doubt as to the day on which the offense occurred." *Marlowe v. Commonwealth*, 2 Va. App. 619, 623-24 (1986). Here, Murphy provides no case law or authority to support his contention that time is an element of assault and battery of a family member. As time is not an element of the offense, the Commonwealth was not required to prove the exact date of the offense, if the evidence established beyond a reasonable doubt that the crime occurred, and Murphy committed the crime.

Viewing this evidence in the light most favorable to the Commonwealth, the evidence established that Murphy slapped T.S. in the face twice while they were having dinner on June 26, 2022. On June 27, 2022, T.S.'s son interjected himself into an argument T.S. was having with Murphy. Murphy, angry that T.S.'s son interposed, charged at T.S.'s son. T.S. inserted herself between Murphy and her son and put her hand on Murphy's chest. In response, Murphy pushed T.S.'s hand away. Considering all the circumstances, a reasonable fact finder could conclude beyond a reasonable doubt that Murphy committed an unjustified assault and battery of a family member.

## II. Possession of a Firearm by a Felon

Murphy argues that there was no direct evidence that he possessed the firearms found in the attic. "It shall be unlawful for . . . any person who has been convicted of a felony . . . to knowingly and intentionally carry about his person, hidden from common observation, any weapon described in subsection A of § 18.2-308." Code § 18.2-308.2(A)(i).

"A conviction for the unlawful possession of a firearm can be supported exclusively by evidence of constructive possession." *Rawls v. Commonwealth*, 272 Va. 334, 349 (2006). Constructive possession is largely a factual determination entitled to deference by this Court. *Smallwood v. Commonwealth*, 278 Va. 625, 631 (2009). To establish constructive possession, the Commonwealth may prove through the defendant's acts, statements, conduct, or any other relevant facts and circumstances that the defendant was aware of the presence and character of the firearm and that the firearm was subject to his dominion and control. *Rawls*, 272 Va. at 349. Possession "need not always be exclusive." *Smallwood*, 278 Va. at 630. Though proximity to a firearm alone is generally not enough to prove constructive possession, it can be a probative fact available for the fact finder's consideration. *Rawls*, 272 Va. at 350.

Considering the evidence in the light most favorable to the Commonwealth, the evidence was sufficient for a reasonable fact finder to conclude that Murphy knew the recovered firearms were in the blue backpack. After officers extracted Murphy from 668 Cameron Street's attic, they found a blue backpack and a black sweatshirt amid the attic's disturbed insulation. The attic was vacant except for those items. Within the blue backpack officers discovered a nine-millimeter Taurus and a .380 caliber Hi Point handgun. Testing of the Taurus determined that Murphy could not be eliminated as a contributor to the DNA mixture on that firearm. At trial, T.S. identified the blue backpack as Murphy's. Although Murphy denied ownership of the blue backpack and claimed to have never seen it before, the circuit court, as the fact finder, was free to disbelieve Murphy's self-serving testimony. "In its role of judging witness credibility, the fact finder is entitled to disbelieve the self-serving testimony of the accused and to conclude that the accused is lying to conceal his guilt." *Flanagan v. Commonwealth*, 58 Va. App. 681, 702 (2011) (quoting *Marable v. Commonwealth*, 27 Va. App. 505, 509-10 (1998)). Considering the totality of the evidence, a reasonable fact finder could conclude that Murphy was aware of the firearms in the blue backpack, that they were subject to his dominion and control, and that he was guilty of the charged offense.

### III. Threatening to Burn or Destroy

Murphy asserts that T.S. attested to three different versions of his alleged threat to burn T.S.'s house down. He argues that T.S.'s "inability to accurately state the alleged threat made to her calls her credibility on this subject into question."

"Any person (i) who makes and communicates to another by any means any threat to . . . burn . . . any . . . building or other structure . . . is guilty of a Class 5 felony." Code § 18.2-83(A). "A threat, in the criminal context, is recognized to be a communication avowing an intent to injure another's person or property." *Summerlin v. Commonwealth*, 37 Va. App.

- 11 -

288, 297 (2002) (quoting *Perkins v. Commonwealth*, 12 Va. App. 7, 16 (1991)). "The communication, taken in its particular context, must reasonably cause the receiver to believe that the speaker will act according to his expression of intent." *Id.* (quoting *Perkins*, 12 Va. App. at 16).

As noted above, "[t]he sole responsibility to determine the credibility of witnesses, the weight to be given to their testimony, and the inferences to be drawn from proven facts lies with the fact finder." *Blankenship v. Commonwealth*, 71 Va. App. 608, 619 (2020) (quoting *Ragland v. Commonwealth*, 67 Va. App. 519, 529-30 (2017)). Moreover, "[t]he conclusions of the fact finder on issues of witness credibility may be disturbed on appeal only when we find that the witness' testimony was 'inherently incredible, or so contrary to human experience as to render it unworthy of belief.'" *Ashby v. Commonwealth*, 33 Va. App. 540, 548 (2000) (quoting *Fisher v. Commonwealth*, 228 Va. 296, 299 (1984)). "In all other cases, we must defer to the conclusions of 'the fact finder[,] who has the opportunity of seeing and hearing the witnesses.'" *Id.* (alteration in original) (quoting *Schneider v. Commonwealth*, 230 Va. 379, 382 (1985)).

"A legal determination that a witness is inherently incredible is very different from the mere identification of inconsistencies in a witness' testimony or statements." *Kelley*, 69 Va. App. at 626. "Testimony may be contradictory or contain inconsistencies without rising to the level of being inherently incredible as a matter of law." *Id.*; *see, e.g.*, *Nobrega v. Commonwealth*, 271 Va. 508, 518 (2006) (holding that a witness was not inherently incredible despite minor inconsistencies because "her testimony did not waiver with regard to the acts of sexual intercourse"). "To be 'incredible,' testimony 'must be either so manifestly false that reasonable men ought not to believe it, or it must be shown to be false by objects or things as to the existence and meaning of which reasonable men should not differ.'" *Juniper v.*

- 12 -

*Commonwealth*, 271 Va. 362, 415 (2006) (quoting *Cardwell v. Commonwealth*, 209 Va. 412, 414 (1968)).

The inconsistencies within T.S.'s testimony that Murphy raises to this Court simply do not render her testimony "so manifestly false that reasonable men ought not to believe it[.]" *See id.* At trial, T.S. repeatedly testified that Murphy threatened to burn the townhome down. Any inconsistencies in T.S.'s statements elicited during her direct and cross-examination were put before the circuit court for its consideration. *See Kelley*, 69 Va. App. at 626 ("[A]s Virginia law dictates, '[p]otential inconsistencies in testimony are resolved by the fact finder,' not the appellate court." (second alteration in original) (quoting *Towler v. Commonwealth*, 59 Va. App. 284, 292 (2011))). In exercising its role as the fact finder, the circuit court weighed the evidence and resolved any inconsistencies in favor of the Commonwealth in this case. In fact, the circuit court specifically found that T.S. was credible and Murphy was incredible. Accordingly, we find that the record supports the circuit court's credibility determination, and we will not disturb that finding on appeal.

The evidence established that after Murphy and T.S. argued at the grocery store, they returned to T.S.'s townhome. While driving home, Murphy threatened to kill T.S. and her next boyfriend if she left him. Later, while T.S. was texting her mother, Murphy threatened to burn the house down if T.S. left to pick up her daughter. That night T.S. stayed up and walked around the house and was unable to sleep because of Murphy's threats. T.S.'s reaction to Murphy's statements demonstrated that she believed that he would follow through on his threats. Considering the totality of the circumstances, a reasonable fact finder could conclude beyond a reasonable doubt that Murphy threatened to burn T.S.'s home.

## CONCLUSION

For the foregoing reasons, the circuit court's judgment is affirmed.

*Affirmed.*