COURT OF APPEALS OF VIRGINIA

UNPUBLISHED

Present:   Judges Ortiz, Causey and Callins


DEMETRIUS AGEE TOWNES

                                                    MEMORANDUM OPINION[*]
v.        Record No. 1440-24-3                            PER CURIAM
                                                      DECEMBER 9, 2025
COMMONWEALTH OF VIRGINIA


                FROM THE CIRCUIT COURT OF THE CITY OF DANVILLE
                              James J. Reynolds, Judge

              (James C. Martin; Martin & Martin Law Firm, on brief), for
              appellant.

              (Jason S. Miyares, Attorney General; Craig W. Stallard, Senior
              Assistant Attorney General; on brief), for appellee.


        A jury convicted Demetrius Agee Townes of first-degree murder and use of a firearm

during the commission of murder.  He was sentenced to life imprisonment for the murder, plus

three years' incarceration for the firearm conviction.  In a separate bench trial, the court

convicted him of possessing a firearm as a violent convicted felon and sentenced Townes to five

years' incarceration.

        On appeal, Townes argues that the evidence was insufficient to convict him of

first-degree murder, use of a firearm in the commission of murder, and possession of a firearm

by a violent convicted felon because "self-defense had been established."  Acknowledging that

he did not preserve this claim in the trial court, Townes argues that because he proceeded *pro se*

_____

[*] This opinion is not designated for publication.  *See* Code § 17.1-413(A).

mid-trial, this Court should find that the ends of justice exception to Rule 5A:18 applies. Finding no error and no basis for the exception, we affirm the convictions.[1]

BACKGROUND[2]

In June 2023, Townes reported to the police that he had allowed his sister to borrow his car and then learned that she allowed Joe Martin to drive it. Danville Police Corporal Gleber spoke with Townes and told him that unless he pursued charges, the police could do nothing. Townes said he did not want to pursue charges but added that he would "find Mr. Martin himself and then [the police] would find him in a meat wagon." At the end of the conversation, Townes agreed to meet Corporal Gleber at the magistrate's office to pursue charges. Townes did not appear at the magistrate's office. Instead, a friend, Charmaine Reeves, called Martin to say that Townes "wanted to buy some K2,"[3] arranged to meet on Washington Street where Townes's father lived, then drove Townes to Washington Street. Martin did not know that Reeves and Townes were together during the phone call. Reeves dropped Townes off and parked on a nearby street "[s]o that [her] car wouldn't be seen on Washington Street."

Corporal Gleber retrieved a photograph of Joe Martin from the police system. Soon after, there was a call for shots fired and Corporal Gleber went to the scene. When he arrived, he saw a blue Jeep Liberty matching the description of Townes's car, and Officer Godfrey performing

---

[1] Having examined the briefs and record in this case, the panel unanimously agrees that oral argument is unnecessary because "the dispositive issue or issues have been authoritatively decided, and the appellant has not argued that the case law should be overturned, extended, modified, or reversed." *See* Code § 17.1-403(ii)(b); Rule 5A:27(b).

[2] We recite the facts "in the 'light most favorable' to the Commonwealth, the prevailing party in the trial court." *Hammer v. Commonwealth*, 74 Va. App. 225, 231 (2022) (quoting *Commonwealth v. Cady*, 300 Va. 325, 329 (2021)). In doing so, we discard any evidence that conflicts with the Commonwealth's evidence, and regard as true all the credible evidence favorable to the Commonwealth and all inferences that can be fairly drawn from that evidence. *Cady*, 300 Va. at 329.

[3] K2 is synthetic marijuana.

cardiopulmonary resuscitation on a man identified as Joe Martin. Martin was unresponsive. He had visible gunshot wounds in his chest. Officer Godfrey did not see any weapons in the vehicle.

At the crime scene, Corporal Canaday found nine Blazer brand 9mm Luger shell casings, which he submitted to the Department of Forensic Science (DFS) for analysis. Inside Townes's house, Corporal Canaday collected two boxes of ammunition, three cell phones, a white tee-shirt and towel with red stains, and a Taurus Spectrum 0.380 caliber pistol with one round in the chamber and two rounds in the magazine. The shirt, towel, and a swab from the firearm were submitted to DFS. Canaday also collected forensic evidence from Martin's body at the hospital. He documented a chest and left elbow wound. There was a hotel card and a bag of green leafy material in one of Martin's pockets.

Sergeant Harn was the lead investigator for the case. He saw that the Jeep had multiple bullet holes and there were casings on the ground leading up to the car. The driver's side window was broken, and there was broken glass strewn around the crime scene. The neighbor who lived across the street from the scene of the shooting showed Sergeant Harn three videos of the incident.

Lieutenant Marlow received information about Townes's whereabouts later that night. Within three hours of the shooting, Townes was charged with both first and second-degree murder, use of a firearm in the commission of a murder, and possession of a firearm by a convicted violent felon. During his initial interview, Townes asked "[w]hat was going on," and "[w]hy [was he] being arrested" because he did not know Martin was dead.

At the preliminary hearing, Reeves, who had dated Townes "on and off," testified. Afterward, Townes called her from jail and was "a little upset" about her testimony because she had not testified according to what Townes told her to say.

At trial, Reeves testified that she knew Martin because she had previously "help[ed] him sell his K2." Martin had texted Reeves that he was arriving at the house, and then Reeves heard gunshots. She started the car to leave, then saw Townes "running from the backyard." He "[j]umped in the backseat of the car" and told Reeves to drop him off at another location. Townes did not tell Reeves what had happened, and when he called her later that night, he simply said that he "was okay." The jail call between Townes and Reeves was played for the jury. Reeves said she did not recall what Townes had told her to say at the preliminary hearing.

A neighbor who was on his porch gardening, heard gunshots and saw a man "running down off Washington Street [who] hopped in a car and they took off." Another neighbor had surveillance cameras that captured time-stamped videos of Martin arriving; Townes exiting his father's house and firing multiple gunshots at the car and fleeing the scene; and Leticia Townes, Townes's sister, leaving her father's house wearing a blood-stained shirt with a visible bleeding wound to her wrist. The jury reviewed body-worn camera video from Corporal Gleber's initial conversation with Townes; Officer Godfrey's attempts to resuscitate Martin; and Lieutenant Marlow's arrest of Townes.

Forensic analysis of the Blazer caliber 9mm Luger cartridges collected at the scene determined that all nine were fired from the same firearm. The officers' search of the Jeep revealed no handgun and no "spent .380 ammunition." Photographs of the Jeep showed "[h]oles in the vehicle from projectiles" around the driver and passenger doors, the fenders, the wheel wells, and the door handles. The driver side windows and windshield were broken out, and glass shards were inside the car.

At the lunch break, Townes advised the trial court, "I wanna fire my lawyer." The court denied the motion. Townes persisted, stating that he would "like to represent himself" and that he wanted to look at the evidence received in discovery. The trial court asked Townes questions

- 4 -

under oath about self-representation. Townes said that "if [his attorney was] gonna sell [him] out [he was] gonna represent himself." Townes acknowledged that he would be "held to the same standards" as a practicing attorney, would be required to know the rules, and that if he failed to object to something, he "may be waiving any ability to challenge that on appeal." The trial court cautioned Townes about the potential danger to him from "chang[ing] horses midstream." The trial court found that Townes had "knowingly, intelligently, and voluntarily" waived his right to have counsel represent him during the rest of the trial. The trial court directed counsel to serve as stand-by counsel.

Dr. Amy Tharp, Assistant Medical Examiner, testified that Martin suffered two gunshot wounds. She described how the path of one gunshot wound "went into his left elbow" and lodged in the soft tissue. Another gunshot entered Martin's chest, hit the aorta and superior vena cava, then travelled through his right lung, through his ribs, and lodged behind his right shoulder blade. Martin suffered fatal blood loss into his chest. Tharp confirmed that the chest wound alone was lethal. The position of the entrance on the left elbow suggested that Martin's arm was up, "almost as a shield motion," when he was shot.

At the close of the Commonwealth's evidence, Townes declined to make any motions. He called Susan Greenspoon, a forensic molecular biologist, to testify about her analysis of a DNA mixture, isolated from swabs of the firearm. She developed DNA profiles from Leticia and Demetrius Townes and compared them to the swab from the Taurus Spectrum pistol, the stained white shirt, and reference buccal samples. Her results showed that Leticia Townes, Townes, and Joe Martin could not be eliminated as contributors to the DNA mixture on the firearm. Greenspoon acknowledged that she could not say how or when the DNA was left on the gun, and acknowledged that DNA takes "quite a long time" to degrade.

Townes testified that Joe Martin stole his truck. He said that he was "[s]peaking out of emotion" when he said Martin was "going to end up in a meat wagon." He claimed that Reeves offered to set up a meeting so he could retrieve his truck from Martin. According to Townes, Martin had threatened to "pop [his] top" when he learned that Townes had reported the truck stolen and that if Townes did not exit his father's house when he arrived, Martin was going to "shoot it up." When he went to the door, he saw Martin "cock[] his gun," so Townes fired one shot. Martin sat back in his seat, and Townes fired two more shots. When Martin refused to follow his commands, Townes fired more shots. After Martin said that his "gun ain't working," Townes "calm[ed] down," but he fired three more shots at Martin when he saw Martin try to fire again. When he saw Martin "not doing nothing," Townes left the gun and exited the house through the back door.

Townes said that Reeves lied when she said there was no communication between him and Martin and that she lied about setting up a K2 buy for Townes. He denied that he "caught a ride" with Reeves after the shooting. Townes admitted that Martin "didn't shoot" because "his gun didn't shoot."

The trial court instructed the jury on first-degree murder, second-degree murder, and voluntary manslaughter; right to arm, use of a firearm during the commission of a murder; and fault and no-fault self-defense. The jury convicted Townes of first-degree murder and use of a firearm in the commission of a felony. After receiving instructions for the punishment phase, the jury fixed Townes's sentence to life imprisonment for the murder and three years for using the firearm. The trial court separately convicted Townes of possessing a firearm as a convicted violent felon and sentenced him to five years' imprisonment. This appeal followed.

ANALYSIS

"No ruling of the trial court . . . will be considered as a basis for reversal unless an objection was stated with reasonable certainty at the time of the ruling, except for good cause shown or to enable this Court to attain the ends of justice." Rule 5A:18. Townes acknowledges that he did not preserve his argument but asks this Court to apply the ends of justice exception to Rule 5A:18. He argues that the "facts needed to support [the self-defense claim] are wholly contained in the record."

The "'ends of justice exception is narrow and is to be used sparingly,' and applies only in the extraordinary situation where a miscarriage of justice has occurred." *Cornell v. Commonwealth*, 76 Va. App. 17, 31 (2022) (quoting *Conley v. Commonwealth*, 74 Va. App. 658, 682 (2022)). To avail oneself of the exception, "[the appellant] must affirmatively show that a miscarriage of justice has occurred, not that a miscarriage *might* have occurred." *Holt v. Commonwealth*, 66 Va. App. 199, 210 (2016) (en banc) (alteration in original) (quoting *Redman v. Commonwealth*, 25 Va. App. 215, 221 (1997)). "'It is never enough for [an appellant] to merely assert a winning argument on the merits—for if that were enough, procedural default "would never apply, except when it does not matter."'" *Winslow v. Commonwealth*, 62 Va. App. 539, 546 (2013) (quoting *Alford v. Commonwealth*, 56 Va. App. 706, 710 (2010)).

The exception applies when there has been a "'grave injustice' or a wholly inexcusable 'denial of essential rights.'" *Id.* at 546-47 (quoting *Brittle v. Commonwealth*, 54 Va. App. 505, 513 (2009)). The error must be "clear, substantial and material." *Brown v. Commonwealth*, 279 Va. 210, 219 (2010) (quoting *West v. Commonwealth*, 43 Va. App. 327, 338 (2004)). An appellant bears a "heavy" burden to demonstrate that a miscarriage of justice has occurred. *Holt*, 66 Va. App. 210 (quoting *Brittle*, 54 Va. App. at 514). Generally, meeting that burden requires an appellant to "point . . . to a particular place in the record" affirmatively establishing a manifest injustice. *Brittle*,

54 Va. App. at 517, 519 (declining to apply the exception because, in part, the appellant "failed to point [this Court] to a place in the record that affirmatively establishes that an element of the offense did not occur").

Townes argues that a manifest injustice occurred in his case because the record established that he acted in self-defense. In support of his argument, Townes points to his own testimony that Martin said that he was going to "pop [his] top" and "shoot up" his father's house, and his claim that Martin had a "firearm." But by his own account, Townes grabbed a gun, went outside, and shot at Martin repeatedly. Townes admitted that Martin "didn't shoot at [him]."

Self-defense presents a factual question for the jury. It is "an affirmative defense which the accused must prove by introducing sufficient evidence to raise a reasonable doubt about his guilt." *Hughes v. Commonwealth*, 39 Va. App. 448, 464 (2002) (quoting *Smith v. Commonwealth*, 17 Va. App. 68, 71 (1993)). "Whether an accused proves circumstances sufficient to create a reasonable doubt that he acted in self-defense is a question of fact." *Bell v. Commonwealth*, 66 Va. App. 479, 486 (2016) (quoting *Smith*, 17 Va. App. at 71). The fact finder must determine whether the appellant acted in reasonable apprehension of bodily harm. *See, e.g.*, *Diffendal v. Commonwealth*, 8 Va. App. 417, 421 (1989) (explaining that a person "is privileged to exercise reasonable force" when he or she "reasonably apprehends bodily harm by another" and "exercise[s] reasonable force to repel the assault"). Self-defense also requires a finding that the force used by the appellant was reasonable in relation to the threatened harm. *See Caison v. Commonwealth*, 52 Va. App. 423, 440 (2008).

"Virginia law recognizes two forms of self-defense to criminal acts of violence: self-defense without fault ('justifiable self-defense') and self-defense with fault ('excusable self-defense')." *Jones v. Commonwealth*, 71 Va. App. 70, 94 (2019) (quoting *Bell*, 66 Va. App. at 487). "Any form of conduct by the accused from which the fact finder may reasonably infer

that the accused contributed to the affray constitutes 'fault.'" *Id.* at 94-95 (quoting *Smith*, 17 Va. App. at 71). Excusable self-defense occurs where an accused, "although in some fault in the first instance in provoking or bringing on the difficulty, when attacked retreats as far as possible, announces his desire for peace, and kills his adversary from a reasonably apparent necessity to preserve his own life or save himself from great bodily harm." *Avent v. Commonwealth*, 279 Va. 175, 200 (2010).

Townes was not privileged to use more force than was reasonably necessary to protect himself from the perceived harm. But the video showed that Martin did not get out of the car or move toward the house, and did not show any sign of gunfire from the car. It showed that Townes slowly walked toward the car with his gun pointed at it, fired multiple shots, then returned to his father's house. Townes did not retreat as far as he safely could under the circumstances in a good-faith attempt to abandon the fight. Nine casings were found outside Townes's house and multiple "[h]oles in the vehicle from projectiles."

No gun and no casings were found in the Jeep or on Martin's person. After shooting Martin, Townes returned to the house, discarded the firearm, then left. There was no evidence that Townes reasonably feared that he was in imminent danger of being killed or injured or that he used no more force than necessary to protect himself. In short, he failed to meet his burden to convince the jury that he acted in self-defense. Based on this record, we cannot say that a manifest injustice occurred here. Townes has failed to meet the heavy burden required for this Court to apply the ends of justice exception to Rule 5A:18.

CONCLUSION

For the foregoing reasons, the trial court's judgment is affirmed.

*Affirmed.*